UNITED STATES, Appellee,

v.

Sergeant William P. HAMILTON, 465–13–5709, United States Army, Appellant.

ACMR 9100707.

U.S. Army Court of Military Review.

21 Dec. 1992.

For Appellant: Colonel Malcolm H. Squires, Jr., JAGC (argued); Captain Michael P. Moran, JAGC; Captain Teresa L. Norris, JAGC (on brief); Major Fran W. Walterhouse, JAGC.

For Appellee: Captain Steven M. Walters, JAGC (argued); Colonel Dayton M. Cramer, JAGC; Lieutenant Colonel Joseph A. Russelburg, JAGC; Major Kenneth T. Grant, JAGC; Captain Maria S.L. Chapa, JAGC (on brief).

Before De GIULIO, ARKOW, and WALCZAK, Appellate Military Judges.

## OPINION OF THE COURT

De GIULIO, Senior Judge:

Appellant was tried by special court-martial composed of officer and enlisted members. Pursuant to his pleas of guilty, he was found guilty of aggravated assault, in violation of Article 128, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 928 (1982). Contrary to his pleas, he was found guilty of failure to obey a lawful general regulation, in violation of Article 92, UCMJ, 10 U.S.C. § 892 (1982). He was sentenced to a bad-conduct discharge, confinement for two months, and forfeiture of $502.00 pay per month for two months. The convening authority approved the sentence.

Only two of appellant's six assertions of error will be discussed in this opinion. They are as follows:

I.

THE FINDINGS AND SENTENCE MUST BE SET ASIDE AND THE CHARGES DISMISSED IN ORDER TO NEGATE THE EFFECTS OF UNLAWFUL COMMAND INFLUENCE IN THE

PREFERRAL AND REFERRAL OF THE CHARGES.

V.

THE MILITARY JUDGE COMMITTED PLAIN ERROR BY HIS FAILURE, *SUA SPONTE*, TO PREVENT THE ADMISSION OF EVIDENCE CONCERNING APPELLANT'S NON-JUDICIAL PUNISHMENT BASED ON THE SAME CONDUCT FOR WHICH HE WAS COURT-MARTIALED.

We find these assertions of error without merit. We find there was no unlawful command influence and that the erroneous admission of evidence of nonjudicial punishment was waived. We will, however, take action to ensure appellant receives complete credit for the prior nonjudicial punishment.

Although not asserted, this Court has found that the court members were improperly advised of appellant's pleas of guilty to the aggravated assault specification during preliminary instructions, without the record indicating appellant's request that the court members be informed. We will cure that error by affirming the finding of guilty of the aggravated assault only. Because the assertions of error not discussed in this opinion concern the offense not affirmed (failure to obey a general regulation), this Court's disposition renders them moot. We will reassess the sentence.

Appellant was involved in an altercation with his neighbor, who was also a soldier. During this incident, appellant cut the other soldier on the neck with a hunting knife and on the chest with a razor. Appellant's company commander punished appellant under the provisions of Article 15, UCMJ. The punishment imposed was forfeiture of $307.00 and performance of seven days of extra duty. Subsequently, the special court-martial convening authority preferred charges against appellant and forwarded them, recommending trial by special court-martial authorized to impose a bad-conduct discharge. Appellant's trial resulted in a sentence which requires this Court's review under Article 66(b), UCMJ, 10 U.S.C. § 866(b).

Before this Court, appellant contends that command influence affected his case, requiring the setting aside of the findings and the sentence. To support this assertion, appellant asked this Court to admit an affidavit of trial defense counsel. That affidavit stated that Sergeant First Class (SFC) Passut, the senior legal clerk for the special court-martial jurisdiction, Division Support Command (DISCOM), 5th Infantry Division (Mechanized), had relayed to counsel that unlawful pressure had been placed upon the special court-martial convening authority to prefer charges. Counsel's affidavit stated, "SFC Passuit [sic] did not wish to be directly involved in this matter for fear that it could come back to haunt him. His indirect involvement wasn't a problem, so he gave me the following information as he remembers ..." Based on this affidavit, appellant filed a motion asking this Court to order a hearing in accordance with *United States v. DuBay*, 37 C.M.R. 411 (C.M.A.1967), and to hold review of the case in abeyance until the hearing was completed. Not being satisfied that that information provided a sufficient basis upon which a hearing should be ordered, this Court denied the motion and ordered government appellant counsel to obtain affidavits from key personnel, to include an affidavit from SFC Passut.[1]

*SFC Passut's Affidavit*

SFC Passut's subsequent affidavit reflects that he was the senior legal clerk for DISCOM and worked for the special court-martial convening authority, Colonel (COL) Solomon.[2] According to SFC Passut, appellant's company commander had request-

---

1. The denial of this motion resulted in filing a Petition for Extraordinary Relief in the Nature of a Writ of Mandamus and a Suggestion For En Banc Consideration. The Suggestion for En Banc Consideration was not adopted and the petition was denied. *Hamilton v. De Giulio,* 35

M.J. 829 (A.C.M.R.1992); *Hamilton v. De Giulio,* ACMR 9102493 (A.C.M.R. 10 July 1992) (order) (unpub.).

2. Colonel Solomon has been promoted to Brigadier General.

ed him to prepare a company-grade Article 15 to impose on appellant for the incident. Although he questioned the propriety of this action because of the seriousness of the offense, SFC Passut was assured that the offense was not as serious as it appeared and disposition at that level was appropriate. About two weeks later, SFC Passut received a call from Lieutenant Colonel (LTC) Keyser, a National Guard judge advocate on active duty for Desert Storm, who was working in the staff judge advocate's (SJA) office. LTC Keyser informed SFC Passut that he had been given a copy of the police blotter report on the incident by the Chief of Justice, Captain (CPT) Knieb, and was told to follow up on it. SFC Passut informed LTC Keyser that a company-grade Article 15 had already been imposed. LTC Keyser indicated that "it looked like a court-martial offense." In his affidavit, SFC Passut stated, "During the conversation he agreed with me that the SJA office is an advisory group to assist us and should not dictate to us how a particular case is to be handled or at what level a case is to be handled." Later, SFC Passut received a call from LTC Keyser. He was informed that an Article 15 was not an acceptable solution and that court-martial charges would have to be preferred. A meeting was set between COL Solomon, LTC Keyser, CPT Knieb, and SFC Passut.

According to SFC Passut, at the meeting, CPT Knieb informed COL Solomon that the Article 15 was not acceptable, that charges would have to be preferred, that COL Solomon could prefer the charges, or they would be preferred at a higher level. COL Solomon was irate when he found an Article 15 had already been imposed, because he felt the offense deserved more than a company-grade Article 15.

After the meeting, COL Solomon wanted to impose a field-grade Article 15, but was correctly advised by SFC Passut that he could not do so. SFC Passut's affidavit reflects,

[H]e said 'That doesn't give me much choice.' He did not seem pleased. He did not want to go forward with charges at all. That is why he wanted to do something at his level. When I told him that he could not give an article 15, he told me to prepare court-martial charges.

After preferring charges, he recommended a special court-martial empowered to adjudge a bad-conduct discharge (BCD). Although without specific knowledge, SFC Passut's impression was "that COL Solomon felt that the Commanding General wanted this to be a court-martial. I'd have to say that COL Solomon went with the will of the Commanding General rather than his own." [3] SFC Passut, however, also stated that COL Solomon could be described as "doing what he wanted." He could not recall COL Solomon being pressured on a case. He further stated, "It's possible that COL Solomon preferred charges because after finding out that he could not do an Article 15, he decided a court-martial was the appropriate disposition in this case."

### LTC Keyser's Affidavit

LTC Keyser's affidavit reflects that he was a member of the "Louisiana Brigade," a National Guard unit activated for Operation Desert Storm/Desert Shield as a "round out" brigade for the 5th Infantry Division (Mechanized). In his civilian job, he is the Chief of the Lands and Natural Resources Section of the Louisiana Department of Justice. After being activated, he eventually was assigned to the SJA Office as a trial counsel. At that office, the staff judge advocate, COL Mogridge, presided over weekly meetings concerning criminal law to insure all cases were properly identified, expediently processed, and aggressively pursued. LTC Keyser learned of the appellant's case at a meeting in January 1991. He was told to contact the unit and see what was being done. The offense had occurred in November 1990. LTC Keyser contacted SFC Passut and was told that appellant had been given an Article 15 for

---

3. During oral argument, appellant's counsel conceded that the Commanding General was not involved during the preferral of charges.

This seems to be only the impression of SFC Passut.

the offense. After being informed of the disposition, the SJA said the disposition was unsatisfactory and the seriousness of the offense suggested a court-martial, preferably a special court-martial authorized to impose a bad-conduct discharge. Subsequently, LTC Keyser had about six meetings with SFC Passut. He told SFC Passut that if charges were not preferred by COL Solomon, then the case would be "sucked up to our level," a phrase used by the SJA and his deputy. When it appeared that "COL Solomon was resisting the pressure to court-martial," LTC Keyser, CPT Kneib, and SFC Passut met with COL Solomon. At that meeting, according to LTC Keyser,

> In essence, CPT Kneib told COL Solomon that an Article 15 for SGT Hamilton was an unacceptable resolution of the case. He told him several times that COL Mogridge felt that SGT Hamilton should be court-martialed and would accept nothing less. Colonel Solomon was told that if he did not prefer the charges that the case would be 'sucked up' to our level and taken to the Commanding General (CG).

Later, when COL Solomon continued to resist, "COL Mogridge was insistent that COL Solomon would have to prefer charges or the matter would be taken out of his hands." COL Keyser believed that it was standard procedure for the SJA personnel to tell commanders that they had to prefer charges or cases would be "sucked up to a higher level." LTC Keyser believed this to be an improper exercise of command influence.

### CPT Kneib's Affidavit

Captain Kneib's affidavit reflects that he was the Chief of Criminal Law in the SJA office. Although he met with COL Solomon several times, he does not specifically recall a meeting concerning appellant's case. He could very possibly have said that COL Mogridge wanted the case tried by court-martial, but does not recall making such a statement in this case. He remembers that LTC Keyser did not want to prosecute the case, but that COL Mogridge wanted the case to go to court-martial and directed LTC Keyser to "push for a court-martial." Although CPT Kneib was

the Chief of Criminal Law, COL Mogridge took a hand in all cases and was briefed on everything in criminal law. COL Mogridge read the blotter reports and sent notes to CPT Kneib or the trial counsel stating, "this case should be a GCM," or "this case should be a BCD–SPCM," or "check on this." When his opinion on disposition differed from a commander's opinion, COL Mogridge would direct trial counsel to ensure his desired disposition. CPT Kneib's view was summarized in his affidavit as follows:

> Considering all things together, it appeared that COL Mogridge wanted to control all aspects of military justice at Fort Polk. He would put pressure on commanders to dispose of cases in the manner he desired, he would recommend to the CG the panel members to be selected or excused, he would recommend to the CG what action should be taken on each case, and he would then brief either myself or trial counsel on how the case should be tried.

### COL Mogridge's Affidavit

COL Mogridge's affidavit indicates that while he was the SJA at Fort Polk he had weekly staff meetings with personnel of his Criminal Law Division. Because LTC Keyser and others were National Guard Judge Advocates activated for Desert Shield/Desert Storm and were unfamiliar with the military justice system, he attempted to make these meetings informative as well as a means to track cases. Appellant's case was raised at one of these meetings. COL Mogridge indicated that this was a serious case of intentional infliction of grievous bodily harm and that SJA personnel would monitor it. He instructed LTC Keyser to determine what action the command wanted and to report his findings at the next meeting. Later, LTC Keyser reported that the company commander had given appellant an Article 15 for the incident. COL Mogridge's response was to the effect that an Article 15 was inappropriate and that such cases should be "disposed of at a higher level than an Article 15 level disposition." He told them that the case

was "court-martial material" but he "did not express my opinion in any manner whereby they could conclude that I was assigning or tasking either of them to go out and get a recommendation for disposal at a court-martial." COL Mogridge wanted to make sure that the "Brigade [sic] Commander" made an informed decision. He stated, "As it turned out, the Brigade [sic] Commander had not been told of the incident and the Company Commander was attempting to protect the accused because they had a close relationship." COL Mogridge did not recall discussing appellant's case with COL Solomon. He denied telling LTC Keyser or CPT Kneib to inform COL Solomon that if he didn't take the case to court-martial, COL Mogridge would seek a referral at a higher level. COL Solomon preferred charges and recommended a trial by BCD special court-martial. At the time of referral, COL Mogridge advised the general court-martial convening authority of the facts of the case, to include the imposition of the Article 15, preferral of charges by COL Solomon, and COL Solomon's recommendation for BCD court-martial. Although the general court-martial convening authority wanted trial by general court-martial, he reluctantly followed the recommendations for trial by BCD special court-martial.

### Colonel Solomon's Affidavit

In his affidavit, COL Solomon states that he never had reason to believe the SJA or anyone from his office attempted to exercise undue influence in UCMJ actions. He became aware of the appellant's case when SFC Passut told him that COL Mogridge wanted to know if he had been involved in the case. When he learned appellant had been given a company grade Article 15 for the incident, he decided that the case was

too serious for that disposition. After conducting his investigation of the case, to include interviews with appellant and the victim, he concluded that an aggravated assault had been committed and that a court-martial was the appropriate forum to resolve the allegations. Although he knew COL Mogridge considered the Article 15 a "slap on the wrist," he did not feel pressured to take UCMJ action which he did not feel appropriate. He was never told that the commanding general wanted any particular level disposition. To COL Solomon, the issue was whether the case should be a BCD special or general court-martial. He does not recall having a meeting with COL Mogridge or SJA personnel concerning the case. He stated,

My purpose was to maintain discipline in my unit, treat SGT Hamilton fairly, and to insure justice was done. I am certain that the decisions I made were my own decisions, based upon what I determined to be appropriate. I was not pressured by MG Crouch, COL Mogridge or any other person, to take action against SGT Hamilton.[4]

### Necessity of DuBay Hearing

This Court must first determine if a limited hearing conducted pursuant to *United States v. DuBay*, 37 C.M.R. 411 (C.M.A.1967), is necessary to resolve appellant's allegations of command influence. Although a *DuBay* hearing is the preferred method to resolve issues dealing with command influence, it is not the only method. *See United States v. Cruz*, 25 M.J. 326, 328 n. 1 (C.M.A.1987) (extra-record sworn statements and an administrative investigation used to establish a factual basis); *United States v. Redman*, 33 M.J. 679 (A.C.M.R.1991) (affidavits, testimony in a related case, and an administra-

4. The affidavits in this case are sworn transcripts of teleconferences between the affiants and appellate counsel for both parties. Much confusion initially resulted because defense and government appellate counsel attempted to combine appellant's case with other cases which are pending before another panel of this Court. Those cases have come to be known as the Louisiana National Guard cases. Although those individuals also belonged to the unit over

which COL Solomon exercised UCMJ authority, they are not otherwise related to this case. The bulk of the information in the initial teleconference transcripts deals with those Louisiana National Guard cases, are not relevant to appellant's case, and have not been admitted as exhibits before this Court. During oral argument, defense appellate counsel agreed that the cases were not related.

tive investigation were used as the factual basis concerning the issue of command influence). Although the affidavits were initially ordered by this Court to determine the necessity for a *DuBay* hearing, we are now satisfied that this is one of those rare cases in which we have sufficient credible information before us to decide the issue without returning the case for a limited hearing.

### Command Influence

Concerning the command influence issue, in *United States v. Hawthorne*, 22 C.M.R. 83 (C.M.A.1956), a company commander believed that he was required to recommend trial by general court-martial for a particular type case because of a published directive. It was held that the directive was an improper exercise of command influence because it deprived the immediate commander of his independent discretion. *See also United States v. Hinton*, 2 M.J. 564 (A.C.M.R.1976) (error where battalion commander coerced company commander to recommend trial by general court-martial when he intended to recommend trial by summary court-martial); *United States v. Rivera*, 45 C.M.R. 582 (A.C.M.R.1972) (immediate commander's discretion usurped after twice recommending Article 15 when battalion commander directed him to consider the file for BCD special court-martial); *United States v. Charleson*, 26 C.M.R. 630 (A.B.R.1958) (company commander convinced by battalion commander to recommend general court-martial despite his views on the matter—held to be unlawful command influence).

■ On the other hand, a superior authority may lawfully control the disposition of disciplinary problems by legitimate means, such as: appointing an officer to make a preliminary inquiry into suspected offenses and to prefer appropriate charges if the facts shown by the inquiry warrant the preferring of charges,[5] withholding of authority to dispose of specific offenses, or preferring charges himself. *United States v. Rivera*, 45 C.M.R. at 584 (A.C.M.R.1972). It is also clear that a superior commander can repudiate a subordinate commander's nonjudicial punishment imposed for a serious offense and order trial himself. *Hinton*, 2 M.J. at 565; *United States v. Wharton*, 33 C.M.R. 729 (A.F.B.R.1963), *petition denied*, 33 C.M.R. 436 (C.M.A.1963).

■ In the case before us, the question is whether the actions of the staff judge advocate or his staff coerced COL Solomon into preferring charges against the accused. COL Solomon's affidavit is the key to this issue. His affidavit clearly states that it did not. We find no convincing evidence to cause us to conclude that COL Solomon's statement is not credible. Consequently, we find as a matter of fact that the decision to prefer charges against the appellant and to forward the charges with a recommendation for trial by a special court-martial authorized to adjudge a bad-conduct discharge was the independent decision of COL Solomon. We find that decision was untainted by unlawful influence of the superior authority, the staff judge advocate, or the staff judge advocate's staff. *See* UCMJ art. 66(c). We are satisfied beyond a reasonable doubt that appellant's case was not tainted by command influence. *See United States v. Thomas*, 22 M.J. 388, 394 (C.M.A.1986); *see also United States v. Levite*, 25 M.J. 334, 341 (C.M.A.1987) (Cox, J. concurring).

### Mixed Pleas

■ This case involves mixed pleas. Prior to calling the court members, the following colloquy occurred:

MJ: Let us just pursue the—the remaining fact of the plea of guilty. In which case, would it be the defense's desire that the panel members then be informed

---

5. *See* Manual for Courts–Martial, United States, 1969 (Rev. ed.), para. 29b. Although this provision was not included in Manual for Courts–Martial, United States, 1984, its exclusion does not mean that the procedure was rejected. *Cf. United States v. Smith*, 23 M.J. 744, 746 (A.C.M.R.1987) *petition denied*, 25 M.J. 213 (C.M.A.1987) (deletion of statement that an unsworn statement was not evidence was not a rejection of the rule but an indication that it was so well established that its restatement was unnecessary).

of the plea of guilty as the Specification under Charge II or just be provided with a flyer as to the remaining specifications?

DC: Just a moment, sir. [Defense counsel consulted with individual defense counsel.]

DC: Sir, the panel is just on sentencing with reference to Charge I.

MJ: I don't understand. How can the panel be just for sentencing if the government is going to provide evidence as to the remaining specification?

DC: We just wanted to hear that remaining specification.

TC: My understanding was that the panel was for sentencing on both charges. I never have heard that they just be in one. How do you—I'm confused about this procedure, but I assume that since I was not—nothing else was discussed, that they would sentence on both charges so obviously they'd have to hear the plea of guilty and hear the evidence on the other charge.

MJ: Well, let us just take a very brief recess, and we'll discuss this in my chambers rather than take up court time on it and then we'll resolve that matter. At this time, let us have a brief recess."

When the court was called to order, the military judge announced, "And just for the record, please note that at our 802 session we discussed the proper procedures that will be followed." Subsequently, without a request on the record that the members be informed of the guilty plea, the military judge informed them of the mixed pleas.

██ It is inappropriate for the military judge to inform the members that the accused has pleaded guilty to some offenses before trial on the merits of other offenses. *United States v. Smith,* 23 M.J. 118 (C.M.A.1986); *United States v. Rivera,* 23 M.J. 89 (C.M.A.1986); *United States v. Nixon,* 15 M.J. 1028 (A.C.M.R.1983); *see* Dep't of Army, Pam. 27–9, Military Judges' Benchbook, para. 2–25 n. 5 (C1, 15 Feb 1985). Where the members are erroneously informed, the error must be tested for prejudice. *Rivera,* 23 M.J. at 97–98.

██ In this case the discussion concerning the "procedures" to be followed presumably took place in an unrecorded session pursuant to the Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 802 [hereinafter R.C.M.]. The record does not indicate whether appellant requested the members be informed of the guilty plea. If such a request occurred, it was made in the R.C.M. 802 session. We will not guess the contents of the R.C.M. 802 session. This court has cautioned military judges on the use of R.C.M. 802 sessions concerning issues which may become the subject of appellate review. *See United States v. Washington,* 35 M.J. 774 (A.C.M.R.1992); *United States v. Loving,* 34 M.J. 956, 963 n. 10 (A.C.M.R. 1992). Here, the offense to which the appellant pleaded not guilty, violation of a regulation by possessing a knife and razor, is closely related to the offense of aggravated assault with the same knife and razor. We find that prejudice resulted in informing the members of the guilty plea to the aggravated assault. We will cure the error by setting aside the finding of guilty to that specification and reassessing the sentence. This Court's action on this offense renders those other assertions of error concerning it moot.

### Prior Punishment Under Article 15, UCMJ

██ Appellant asserts that the military judge committed plain error by his failure to prevent, *sua sponte,* the admission of evidence concerning appellant's nonjudicial punishment based on the same conduct for which he was court-martialed.

During the presentencing procedure the trial counsel offered into evidence the record of nonjudicial punishment which was imposed on the appellant for the aggravated assault. Trial defense counsel indicated that there was no objection to that evidence. Subsequently, trial defense counsel examined defense witnesses, the company commander and the first sergeant, concerning imposition of the punishment. In addition, appellant introduced a stipulation of expected testimony of the officer who im-

posed the punishment. In that stipulation, the officer set forth the reasons why he considered Article 15 punishment appropriate, that he considered appellant rehabilitated, and that appellant should not be discharged. Trial defense counsel then used the imposition of the Article 15 in his argument, in an attempt to convince the court members that the offense was not serious and that he had already been punished for it.

■ Imposition of nonjudicial punishment does not preclude subsequent trial by court-martial of a soldier for a serious offense. *United States v. Pierce*, 27 M.J. 367 (C.M.A.1989).

> Thus in those rare cases [where an accused is also tried by court-martial], an accused must be given *complete* credit for any and all nonjudicial punishment suffered: day-for-day, dollar-for-dollar, stripe-for-stripe. Furthermore, the nonjudicial punishment may not be used for any purpose at trial, such as impeachment (even of an accused who asserts he had no prior misconduct); to show that an accused has a bad service record; or any other evidentiary purpose.

*Id.*, 27 M.J. at 369. It is left to an accused to determine if the prior punishment will be revealed to the court-martial for consideration on sentence. *Id.*

■ At appellant's trial it was error for the prosecution to place the record of punishment before the court. We hold that the error was waived by appellant's failure to object to the evidence. *See* Mil.R.Evid. 103(d); *see also United States v. Collins*, 30 M.J. 991, 993 (A.C.M.R.1990). Waiver is particularly applicable here, where appellant used the prior punishment to his benefit in his argument on sentence.

The best place to insure credit is given for the prior nonjudicial punishment is with the convening authority. *Pierce*, 27 M.J. at 369. The convening authority apparently assumed the court-martial gave appellant credit for the prior punishment, for he approved the sentence. In an abundance of caution we will consider the prior punishment in our reassessment of the sentence. *See United States v. Pierce*, 28 M.J. 1040, 1043 (A.C.M.R.), *enforcing* 27 M.J. 367 (C.M.A.1989).

The assertions of error personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), are without merit.

The findings of guilty to Charge II and its Specification are set aside. Charge II and its Specification are dismissed. The remaining findings of guilty are affirmed. Reassessing the sentence on the basis of the errors noted, *United States v. Sales*, 22 M.J. 305 (C.M.A.1986), and the entire record, only so much of the sentence is affirmed as provides for a bad-conduct discharge.

Judge ARKOW and Judge WALCZAK concur.