UNITED STATES, Appellee

v.

William P. HAMILTON, Sergeant
U.S. Army, Appellant.

No. 93–0581.
CMR No. 9100707.

U.S. Court of Military Appeals.

Argued March 16, 1994.

Decided Sept. 29, 1994.

For Appellant: *Captain Teresa L. Norris* (argued); *Lieutenant Colonel James H. Weise* and *Major Fran W. Walterhouse* (on brief); *Colonel Malcolm H. Squires.*

For Appellee: *Captain Louis E. Peraertz* (argued); *Colonel Dayton M. Cramer, Major Kenneth T. Grant, Major James L. Pohl* (on brief).

*Opinion of the Court*

GIERKE, Judge:

A special court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of violating a lawful general regulation by using and possessing illegal weapons, in violation of Article 92, Uniform Code of Military Justice, 10 USC § 892. Pursuant to his pleas, the court-martial also convicted appellant of aggravated assault, in violation of Article 128, UCMJ, 10 USC § 928. The approved sentence imposed a bad-conduct discharge, and partial forfeitures and confinement for 2 months. The Court of Military Review affirmed the conviction of violating a lawful general regulation, set aside the conviction of aggravated assault (Charge II), and reassessed the sentence, setting aside the confinement and forfeitures.* 36 MJ 723, 731 (1992).

We granted review of the following issues:

---

* Although the opinion of the court below is internally inconsistent, we have not ordered corrective action because the intended decision of that court is clear. At the beginning of their decision, that court stated:

> Although not asserted, this Court has found that the court members were improperly advised of appellant's pleas of guilty to the aggravated assault specification during preliminary instructions, without the record indicating appellant's request that the court members be informed. We will cure that error by *affirming the finding of guilty of the aggravated assault only.* Because the assertions of error not discussed in this opinion concern *the offense not affirmed (failure to obey a general regulation),* this Court's disposition renders them moot.

36 MJ 723, 725 (1992) (emphasis added). This part of the opinion indicates that the conviction of Charge I and its specification (failure to obey a lawful general regulation) would be set aside and the conviction of Charge II and its specification (aggravated assault) would be affirmed.

Later in the opinion, however, the court discussed the erroneous action of the military judge in detail and concluded:

> Here, the offense to which the appellant pleaded not guilty, violation of a regulation by possessing a knife and razor, is closely related to the offense of aggravated assault with the same knife and razor. We find that prejudice resulted in informing the members of the guilty plea to the aggravated assault. We will cure the error by setting aside the finding of guilty to that specification and reassessing the sentence. This Court's action on this offense renders those other assertions of error concerning it moot.

36 MJ at 730.

Finally, the decretal paragraph states:

## I

WHETHER THE FINDINGS AND SENTENCE MUST BE SET ASIDE AND THE CHARGES DISMISSED IN ORDER TO NEGATE THE EFFECTS OF UNLAWFUL COMMAND INFLUENCE IN THE PREFERRAL AND REFERRAL OF THE CHARGES.

## II

WHETHER THE ARMY COURT [OF MILITARY REVIEW] ERRED IN DENYING APPELLATE DEFENSE COUNSEL'S MOTION TO VOIR DIRE THE APPELLATE MILITARY JUDGES.

### Factual Background

The facts underlying the charges were set out by the Court of Military Review as follows:

Appellant was involved in an altercation with his neighbor, who was also a soldier. During this incident, appellant cut the other soldier on the neck with a hunting knife and on the chest with a razor. Appellant's company commander punished appellant under the provisions of Article 15, UCMJ [, 10 USC § 815]. The punishment imposed was forfeiture of $307.00 and performance of seven days of extra duty. Subsequently, the special court-martial convening authority preferred charges against appellant and forwarded them, recommending trial by special court-martial authorized to impose a bad-conduct discharge.

36 MJ at 725.

### Issue I: Unlawful Command Influence

■ This issue was not raised at trial, but was raised for the first time before the Court of Military Review and resolved on the basis of affidavits. The essence of the allegation is that the staff judge advocate, Colonel Mog-

ridge, unlawfully coerced Colonel (now Brigadier General (BG)) Solomon to prefer charges against appellant after appellant's company commander had imposed nonjudicial punishment for the same offenses. Appellant argues that COL Mogridge and his subordinates deprived COL Solomon of his independent discretion in disposing of appellant's case.

Affidavits were submitted to the Court of Military Review from BG Solomon, COL Mogridge, Lieutenant Colonel (LTC) Keyser, Captain (CPT) Kneib, and Sergeant First Class (SFC) Passut. They are set out in detail in the opinion of the court below. 36 MJ at 725–28.

LTC Keyser was a judge advocate in the Louisiana National Guard who was ordered to active duty in support of Operation Desert Storm/Desert Shield. Both he and CPT Kneib worked for COL Mogridge. Their affidavits portray COL Mogridge as an aggressive staff judge advocate (SJA), intimately involved in day-to-day military justice actions, and enjoying the confidence of his commander, Major General (MG) Crouch, the general court-martial convening authority.

LTC Keyser (who was detailed as trial counsel in this case) avers that COL Mogridge believed that appellant's offenses warranted a court-martial and that he was directed to convey his views to COL Solomon. LTC Keyser recalls CPT Kneib telling COL Solomon "that COL Mogridge felt that SGT Hamilton should be court-martialed and would accept nothing less." LTC Keyser also recalls CPT Kneib telling COL Solomon that "if he did not prefer the charges that the case would be 'sucked up' to our level and taken to the Commanding General."

CPT Kneib's recollection of the events preceding appellant's court-martial is sketchy. He recalls, however, that LTC Keyser "did not really want to prosecute this case"; "Colonel Mogridge, however, wanted this

The findings of guilty to Charge II and its Specification are set aside. Charge II and its Specification are dismissed. The remaining findings of guilty are affirmed.... 36 MJ at 731. Although the introductory paragraph of text states that the conviction of Charge I and its specification would be set aside and the

conviction of Charge II and its specification would be affirmed, the decretal paragraph unequivocally states that the court below affirmed the conviction of Charge I and its specification (failure to obey a lawful general regulation) and set aside the conviction of Charge II and its specification (aggravated assault).

case to go to a court-martial and directed that LTC Keyser push for a court-martial." Much of CPT Kneib's affidavit is devoted to describing COL Mogridge's aggressive style.

SFC Passut was COL Solomon's senior legal noncommissioned officer. He states that LTC Keyser informed him that disposition of appellant's offenses by nonjudicial punishment "was not an acceptable solution" and was contrary to the guidance he had received from COL Mogridge. SFC Passut subsequently set up a meeting for COL Solomon, LTC Keyser, CPT Kneib and himself. He described the conversation at the meeting as "professional, not heated." At the meeting, CPT Kneib advised COL Solomon that "the only acceptable solution would be a court-martial."

SFC Passut states that COL Solomon was "irate" when he learned that the company commander had imposed nonjudicial punishment for what appeared to be a serious offense. According to SFC Passut, COL Solomon wanted to impose nonjudicial punishment himself because of the greater punishments which may be imposed by a field grade officer. SFC Passut advised COL Solomon that a second nonjudicial punishment could not be imposed for the same offenses, and COL Solomon then remarked, "That doesn't give me much choice[,]" and told SFC Passut "to prepare court-martial charges."

SFC Passut further states that, before preferring the charges, COL Solomon interviewed both appellant and the victim of the aggravated assault. According to SFC Passut, COL Solomon felt that the victim was a "hoodlum" and appellant was the real victim.

Although SFC Passut did not know the views of MG Crouch about this case, he had the impression "that COL Solomon went with the will of the Commanding General rather than his own." On the other hand, SFC Passut states that "COL Solomon made the decisions on disposition without concern as to what a 'particular' Commanding General wanted.... COL Solomon could be fairly described as doing what he wanted."

COL Mogridge states that he "became aware" of appellant's case during one of his weekly staff meetings. He recalls telling LTC Keyser and CPT Kneib that he considered "a general court-martial ... appropriate" for "an assault case in which grievous bodily harm was intentionally inflicted." He denies tasking LTC Keyser and CPT Kneib to "go out and get a recommendation for disposal at a court-martial." He states that he "wanted to make sure the Brigade [sic] Commander had made an informed decision."

COL Mogridge states that he has "no independent memory of talking with General Solomon about the case," but it would not have been unusual for him to do so. COL Mogridge denies telling anyone "to go to General Solomon's office to tell him that if he didn't take Sergeant Hamilton's case to court-martial, that I would seek a referral at a higher level of disposition." He states that he would have taken no further action if General Solomon had determined that nonjudicial punishment was appropriate "because then a responsible member of the chain of command had made an informed decision."

COL Mogridge states that he briefed MG Crouch on the case after COL Solomon preferred charges and forwarded them to MG Crouch for disposition. MG Crouch told COL Mogridge, "I want a general court-martial out of this." COL Mogridge states that he persuaded MG Crouch to accept the recommendation of COL Solomon for a special court-martial authorized to impose a bad-conduct discharge. According to COL Mogridge, MG Crouch grudgingly accepted COL Solomon's recommendation.

BG Solomon's affidavit, which was considered the "key" by the Court of Military Review, 36 MJ at 729, recites the following:

When I learned that SGT Hamilton's incident had been handled with Article 15 proceedings, I decided that the matter might be too serious to dispose of with a company grade Article 15. My initial reaction was that the matter was probably serious enough to warrant at least a field grade Article 15. After I conducted my own investigation of the incident, including interviewing both SGT Hamilton and the alleged victim of the assault, SGT Swift, I concluded that there was reason to believe that SGT Hamilton had committed an ag-

gravated assault and that a court-martial was the appropriate forum to resolve the allegation against SGT Hamilton.

COL Mogridge was involved in the disposition of this case to the extent that he was the one who informed me that the matter had initially been disposed of by SGT Hamilton's company commander. Although I was aware that COL Mogridge considered the company grade Article 15 to be a "slap on the wrist" for serious misconduct, I did not feel pressured to take any UCMJ action which I did not believe was appropriate. I always make my own decisions on UCMJ actions. I was never told that MG Crouch wanted any particular level of disposition of the charges in this case. For me, the issue was whether the charges would go to a BCD Special Court–Martial or to a General Court–Martial. . . .

I am certain that the decisions I made were my own decisions, based on what I determined to be appropriate. I was not pressured by MG Crouch, COL Mogridge, or any other person, to take any action against SGT Hamilton.

■ The term "unlawful command influence" has been used broadly in our jurisprudence to cover a multitude of situations in which superiors have unlawfully controlled the actions of subordinates in the exercise of their duties under the UCMJ. *See generally United States v. Hawthorne,* 7 USCMA 293, 22 CMR 83 (1956). It is necessary, however, to determine whether the allegation of unlawful command influence in a particular case pertains to the preferral of charges, forwarding of charges, referral, trial, or post-trial review, in order to determine the applicable rules of law.

■ Although any person subject to the UCMJ may prefer charges, the accuser must state that the charges "are true in fact to the best of his knowledge and belief." Art. 30(a)(2), UCMJ, 10 USC § 830(a)(2). Accordingly, "[n]o person may be ordered to prefer charges" which that person does not believe are warranted. RCM 307(a), Discussion, Manual for Courts–Martial, United States, 1984. A person who has been or-

dered or coerced into preferring charges becomes an "accuser" within the meaning of Article 1(9), UCMJ, 10 USC § 801(9). An accuser is disqualified from acting as a convening authority in that case. *United States v. Jeter,* 35 MJ 442 (CMA 1992). Failure to challenge a convening authority on the ground of being an accuser waives the error. *Id.*

■ If a commander is coerced into preferring charges that he does not believe are true, the charges are treated as unsigned and unsworn. *United States v. Miller,* 31 MJ 798, 801 (AFCMR 1990), *aff'd on other grounds,* 33 MJ 235 (CMA 1991); *United States v. Bolton,* 3 CMR 374 (ABR), *pet. denied,* 1 USCMA 711, 3 CMR 150 (1952). This Court consistently has held that failure to object to a defective preferral waives the error. *Frage v. Moriarty,* 27 MJ 341 (CMA 1988); *United States v. Taylor,* 15 USCMA 565, 36 CMR 63 (1965); *United States v. May,* 1 USCMA 174, 2 CMR 80 (1952); *United States v. Miller, supra.*

RCM 401(c)(2)(A) requires that a commander forwarding charges to a superior commander for disposition "make a personal recommendation as to disposition." The requirement for a "personal recommendation" means that "[a] commander's recommendation is within that commander's sole discretion." Furthermore, "[n]o authority may direct a commander to make a specific recommendation as to disposition." RCM 401(c)(2)(A), Discussion. Defects in the forwarding process are waived if not challenged prior to entry of pleas. RCM 905(b)(1).

The referral, trial, and review processes are protected from unlawful command influence by statute. Article 37(a), UCMJ, 10 USC § 837(a), provides in pertinent part as follows:

No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in

the conduct of the proceedings. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts....

 Unlawful command influence at the referral, trial, or review stage is not waived by failure to raise the issue at trial. *See generally United States v. Blaylock,* 15 MJ 190, 193 (CMA 1983). If a party is deterred by unlawful command influence from challenging at trial any defects in the preferral or forwarding of charges, then the provisions of Article 37 are triggered and the issues are not waived, because the trial itself has been subjected to unlawful command influence. Appellant does not assert a violation of Article 37 in the case before us.

Even though an SJA is neither a commander nor a convening authority, we have held that actions by an SJA may constitute unlawful command influence, because "a staff judge advocate generally acts with the mantle of command authority." *United States v. Kitts,* 23 MJ 105, 108 (CMA 1986). We do not believe, however, that every instance of advice or expression of opinion by an SJA is attributed to his or her commander. We also do not believe that SJAs must be timid in expressing their views. SJAs frequently are asked for legal advice by subordinate commanders, and they are obliged to provide competent and candid advice. It is incumbent upon SJAs, however, to make it clear when they are expressing the view of their commanders and when they are expressing their own legal opinions.

Based on the evidence before us, we conclude—as did the Court of Military Review—that appellant has not made out his case for command influence. Accordingly, we hold that the Court of Military Review did not err in concluding that COL Solomon's decision to prefer charges and his recommended disposition of those charges was untainted by unlawful command influence.

 We further hold that any defects in the preferral or forwarding of charges were waived, since appellant did not raise them at trial. *See* 41 MJ at 36. Likewise, any disqualification of MG Crouch or COL Mogridge, on the ground that they were accusers, was waived. *United States v. Jeter, supra* (41 MJ at 36).

 We next consider appellant's assertion that the Court of Military Review erred by resolving the issue against him on the basis of affidavits instead of ordering an evidentiary hearing in accordance with *United States v. DuBay,* 17 USCMA 147, 37 CMR 411 (1967). We agree with the court below.

As we recently pointed out in *United States v. Dykes,* 38 MJ 270, 272 (CMA 1993), "The purpose of such a '*DuBay* hearing' is to enable a military judge at the trial level to make the findings of fact and conclusions of law on collateral matters when the record is incomplete and 'resort to affidavits [is] unsatisfactory.'" We also stated that "[a] post-trial evidentiary hearing is not required if no reasonable person could view the opposing affidavits ..., in light of the record of trial, and find the facts averred by appellant to support his claim of unlawful command influence." *Id.* at 272–73.

In this case there is no conflict between the affidavits of BG Solomon, the officer allegedly influenced, and COL Mogridge, the officer allegedly exercising influence. Appellant cites *United States v. Rosser,* 6 MJ 267, 272 (CMA 1979), for the proposition that "perfunctory statements from subordinates on the effects of command influence," are "inherently suspect." We find *Rosser* inapposite to this case. In the first place, BG Solomon's affidavit is hardly "perfunctory." To the contrary, BG Solomon explains in detail his investigation of appellant's case, his consultations with COL Mogridge, and his thought processes in determining appropriate disposition. BG Solomon unequivocally states that the decision to prefer charges and recommend trial by a special court-martial empowered to adjudge a bad-conduct discharge was his own. BG Solomon's affidavit was supplemented by a 30-page transcript of

a teleconference interview of BG Solomon by government appellate counsel and defense appellate counsel. (Govt.App. Ex. 5.)

Furthermore, COL Solomon was not a subordinate of COL Mogridge; he was a senior commander, equal to or superior in military rank to COL Mogridge at all times in question. Although COL Solomon was a subordinate of MG Crouch, there is no direct evidence that COL Mogridge purported to speak on behalf of MG Crouch in his consultation with COL Solomon or any evidence that COL Solomon perceived that COL Mogridge or his subordinates were expressing the views of MG Crouch.

The only significant conflict in the affidavits is between what LTC Keyser, CPT Kneib, and SFC Passut perceived regarding COL Mogridge's influence on COL Solomon and the reality of his actual influence or lack thereof. It is understandable that COL Mogridge would appear powerful and influential in the eyes of his subordinates but not so in the eyes of a senior commander like COL Solomon. The court below, all experienced military lawyers in their own right, obviously understood this difference of perception when they identified BG Solomon's affidavit as the "key" (36 MJ at 729) in resolving the issue. Suffice it to say that we are satisfied, as was the court below, that there were no significant factual conflicts to be resolved, so an evidentiary hearing was unnecessary for appellant's claims of unlawful command influence.

We hold that the Court of Military Review did not err by resolving the issue of unlawful command influence on the basis of affidavits.

### Issue II: Voir Dire of Appellate Military Judges

Prior to oral argument before the Court of Military Review, appellate defense counsel requested leave to conduct either written or oral in-chambers *voir dire* of two of the three appellate military judges who heard appellant's case. The motion was based on LTC Keyser's statement in his affidavit that COL Mogridge is a good friend of the two appellate military judges and may have played golf with them on several occa-

sions. (¶ 19, Def.App. Ex. C) Appellant states that he did not file a motion to recuse those judges "because there was insufficient evidence for such a motion." Final Brief at 29. The Court of Military Review denied the motion. The order dated November 5, 1992, denying the motion, recites that the two appellate judges in question "have no knowledge of the case other than matters presented for appellate review, have no personal friendship of such a nature as to disqualify them from acting as appellate judges in this case, have reviewed the affidavit of LTC Keyser, and have concluded that no basis for their disqualification from this case exists[.]"

Appellant now argues before this Court that the "plain language" of RCM 902 entitles appellate defense counsel to conduct *voir dire* of appellate military judges. Appellant further argues that appellate military judges are included in the scope of RCM 902, because RCM 902(c)(1) defines "proceeding" as including "appellate review." Final Brief at 29–30.

RCM 902(a) provides that "a military judge shall disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." RCM 902(b) lists five specific grounds for disqualification, including "[w]here the military judge has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding." RCM 902(c) provides: " 'Proceeding' includes pretrial, trial, post-trial, appellate review, or other stages of litigation." Finally, RCM 902(d)(2) provides, "Each party shall be permitted to question the military judge and to present evidence regarding a possible ground for disqualification...."

Appellant argues that the refusal of the appellate military judges to submit to questioning violates RCM 902(d)(2). We disagree with appellant's argument that RCM 902(d)(2) is applicable to judges of the Court of Military Review. RCM 902 applies to a "military judge." The term "military judge" is defined in Article 1(10), UCMJ, 10 USC § 801(10) as "an official of a general or special court-martial"; it does not encompass

appellate military judges on the Court of Military Review. Furthermore, RCM 902 appears in Part II, Chapter IX, Manual for Courts–Martial, United States, 1984, which is entitled, "Trial Procedure Through Findings." There is no comparable procedure for questioning appellate military judges set out in either the UCMJ or in Chapter XII of the Rules for Courts–Martial pertaining to appellate review. The reference to "appellate review" in RCM 902(c)(1) clearly applies to *DuBay* hearings ordered by appellate courts and post-trial sessions directed by a "reviewing authority" in accordance with RCM 1102(d).

As a point of comparison, the disqualification statutes applicable to Article III judges distinguish between trial and appellate judges. A trial judge is disqualified "[w]henever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party...." The affidavit must "be accompanied by a certificate of counsel of record stating that it is made in good faith." 28 USC § 144.

■ On the other hand, appellate judges and Supreme Court justices are covered only by 28 USC § 455, which enjoins them to disqualify themselves "in any proceeding in which his impartiality might reasonably be questioned." This provision is regarded as self-enforcing and does not require filing of affidavits. If the judge refuses to disqualify himself, enforcement is by assignment of error on appeal, interlocutory appeal, or mandamus. *See Davis v. Board of School Commissioners,* 517 F.2d 1044 (5th Cir.1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). *See also Disqualification of Judges and Justices in the Federal Courts,* 86 Harv.L.Rev. 736 (1973).

■ Nevertheless, our examination of Article 1(10) and RCM 902 does not end the matter. RCM 902 is based on 28 USC § 455 and the Code of Judicial Conduct. Drafters' Analysis of RCM 902, Manual, *supra* at A21–45. *See United States v. Mitchell,* 39 MJ 131, 144 (CMA 1994), *cert. denied,* —— U.S.

——, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994). Canon 3C of the Code of Judicial Conduct is virtually identical to RCM 902(a) and 28 USC § 455, in that all three require disqualification of a judge when that judge's "impartiality might reasonably be questioned." The Code of Judicial Conduct applies to judges of the Army Court of Military Review. Paras. 16–9 and 16–10, Army Regulation 27–10, Military Justice (22 December 1989). *See United States v. Mitchell,* 39 MJ at 144 n. 7. The appropriate procedure for an appellant to raise the issue before an appellate court is to file a motion asking the appellate military judge in question to disqualify himself or herself. In this case appellant did not do so, but the Court of Military Review treated his request for *voir dire* as a motion to disqualify and denied it.

■ The appellate standard for reviewing denial of a motion to disqualify is abuse of discretion. *United States v. Mitchell,* 39 MJ at 144 n. 7. In this case the appellate military judges disclaimed any "personal friendship of such a nature as to disqualify them." Furthermore, because the Court of Military Review resolved the issue on the basis of BG Solomon's affidavit and were not required to assess COL Mogridge's credibility, there is no reasonable possibility that friendship might have affected their decision. Accordingly, we hold that the Court of Military Review did not abuse its discretion in denying the motion for *voir dire.*

### Decision

The decision of the United States Army Court of Military Review is affirmed.

Judges COX and CRAWFORD concur.

SULLIVAN, Chief Judge (concurring in part and in the result):

I read the majority opinion to hold that appellant failed to establish his allegation of command influence. Moreover, it opines that any other defects in the preferral of charges against appellant were waived. With these holdings, I agree. To the extent that this opinion could be construed to permit waivers of the command-influence issue, I disagree

for the reasons stated by Judge Wiss in his separate opinion.

WISS, Judge (concurring in the result):

The majority concludes that appellant waived his post-trial complaint of command influence in Colonel Solomon's decision to prefer charges against him. It gets there by the following two-step approach: First, charges which were signed out of coercion rather than a belief in their truth "are treated as unsigned and unsworn"; and second, "failure to object to such a defective preferral [as unsworn charges] waives the error." 41 MJ at 36. In my view, this approach is not based on solid precedent or sound reasoning, so I cannot join in it.

First, in support of its predicate that coerced charges are treated as unsigned and unsworn, the majority cites no precedent from this Court or any logical analysis persuasively leading to such a conclusion, like one would expect regarding a question of first impression here. Instead, it cites only a 1990 opinion out of the Air Force Court of Military Review (*United States v. Miller*, 31 MJ 798, 801, *aff'd on other grounds*, 33 MJ 235 (CMA 1991)) and a 1952 opinion of the Army Board of Review (*United States v. Bolton*, 3 CMR 374, *pet. denied*, 1 USCMA 711, 3 CMR 150 (1952)). On the merits, I am not prepared, in this case in which it would be mere dicta, to make such an equation that relegates the evil of unlawful command influence in this process to the same comparatively innocuous level as inadvertence and technical flaws such as whether the charges were sworn before someone authorized to administer oaths. *See United States v. Reynolds*, 40 MJ 198, 202, and 204 (CMA 1994) (Wiss, J., concurring in part and in the result; and Sullivan, C.J., dissenting). In any event, I do not believe that the majority's approach to jurisprudential evolution of this Court's precedent is prudent.

Second, in support of its conclusion, based on this predicate, that such a defect in preferral of charges is waived by a failure to object, the majority cites three cases from this Court's precedent that truly *do* involve unsworn charges or technical flaws that caused the charges to be treated as unsworn. Both in *Frage v. Moriarty*, 27 MJ 341, 343 (CMA 1988), and in *United States v. May*, 1 USCMA 174, 175, 2 CMR 80, 81 (1952), the problem focused on the fact that the officer who had administered the oath to the accuser was not authorized to do so. The issue addressed in *United States v. Taylor*, 15 USCMA 565, 566, 36 CMR 63, 64 (1965), was the repercussions of appellant's having been tried and convicted, without objection, of charges that never were sworn to, in violation of Article 30(a), Uniform Code of Military Justice, 10 USC § 830(a). In none of these cases did the Court have to come to grips with the cancerous threat of command influence in deciding whether such technical problems were waived by failure to object.

To cap all of this off, note the following irony: The Court of Military Review in *Miller*—the leading case on which the majority relies for the proposition that charges that were signed out of coercion are merely treated as unsigned and unsworn—DID NOT INVOKE WAIVER FOR FAILURE TO OBJECT! Instead, noting that neither the accused nor her defense counsel had become aware "of the possible defect until sometime after the completion of her trial[,]" the court held "that a defective preferral discovered after trial may be asserted for the first time on appeal." In doing so, the court forthrightly equated charges signed under such conditions to an issue of command influence. 31 MJ at 801.

Moreover, in my view, the majority's rationale here cannot be squared with our decision in *United States v. Johnston*, 39 MJ 242, 243–44 (CMA 1994)—an opinion on which the ink is not yet dry! There, this Court declined to apply waiver to an allegation—not raised at trial but, instead, for the first time on appeal—that the decision to prefer charges against the accused had been the product of unlawful command influence. In forthrightly rejecting the Government's assertion of waiver, the majority opinion—authored by the same judge who authors the majority opinion here and signed by three

other judges—quoted the following passage from *United States v. Blaylock,* 15 MJ 190, 193 (1983):

> In view of the policy clearly stated in Article 37[ (a), UCMJ, 10 USC § 837(a) ] we have never allowed doctrines of waiver to prevent our considering claims of improper command control. Indeed, to invoke waiver would be especially dangerous, since a commander willing to violate statutory prohibitions against command influence might not hesitate to use his powers to dissuade trial defense counsel from even raising the issue.

39 MJ at 244. The parallels between this case and *Johnston* are unavoidable: Both involve appellate claims that command influence infected the decision to prefer charges, and both involve failures to raise the claim at trial. The only difference is that, on May 31, 1994, four judges of this Court, for the reasons quoted from *Blaylock,* confronted a contention of waiver and rejected it, whereas today, just a few months later, a majority embraces waiver without so much as citing—much less distinguishing—*Johnston.* I confess, I do not understand.

In the end, however, I concur in affirming the decision below. I agree with the majority when it finally gets around to deciding whether a reasonable person could view the affidavits here, in light of the record of trial, and find the requisite support for a claim of unlawful command influence. *See United States v. Dykes,* 38 MJ 270, 272 (CMA 1993). Based on the majority's analysis of this question, I agree that a factfinding hearing is unnecessary and that appellant's claim should be denied.