# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
COOK, TELLITOCCI, and HAIGHT
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Staff Sergeant RASHAD J. VALMONT**
**United States Army, Appellant**

ARMY 20110644

Headquarters, 3rd Infantry Division and Fort Stewart
James L. Pohl, Military Judge
Lieutenant Colonel Shane E. Bartee, Staff Judge Advocate

For Appellant: Lieutenant Colonel Jonathan F. Potter, JA; Captain A. Jason Nef, JA; Captain James S. Trieschmann, Jr., JA (on brief); Colonel Kevin M. Boyle, JA; Lieutenant Colonel Jonathan F. Potter, JA; Major Amy E. Nieman, JA; Captain James S. Trieschmann, Jr., JA (on supplemental brief).

For Appellee: Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley, JA; Major Robert A. Rodrigues, JA; Captain Steve T. Nam, JA (on brief).

22 October 2014

---------------------------------
OPINION OF THE COURT
---------------------------------

COOK, Senior Judge:

A panel composed of officer and enlisted members sitting as a general court-martial convicted appellant, contrary to his plea, of premeditated murder, in violation of Article 118(1), Uniform Code of Military Justice, 10 U.S.C. § 918 (2006) [hereinafter UCMJ]. The panel sentenced appellant to a dishonorable discharge, confinement for life without the possibility of parole, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority (CA) approved the adjudged sentence and granted 407 days of confinement credit.

Appellant's case is now before us for review pursuant to Article 66, UCMJ. In his initial brief to this court, appellant raised two assignments of error, neither of which merits discussion or relief. Appellant also personally raised matters pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have reviewed these

matters and they do not merit discussion or relief. In his supplemental brief to this court, appellant raises two additional assignments of error,[1] both of which merit discussion but not relief.

**FACTS**

*Background*

On 17 June 2010 at Fort Gillem, Georgia, appellant walked into the office of his supervisor, Master Sergeant (MSG) PM, and shot him six times. Appellant's shots struck MSG PM in the head, torso and arm, killing him almost immediately. After fatally shooting MSG PM, appellant left MSG PM's office, exited the building, got into his car and drove to a local civilian police station. He then turned himself in to a civilian police officer, informing the officer he had just shot someone at Fort Gillem.

The evidence linking appellant to the shooting of MSG PM was extensive. In addition to appellant's incriminating statement to law enforcement, eyewitnesses of the killing identified appellant as the shooter. Ballistics analysis confirmed appellant's pistol, recovered from his car, was the weapon used to kill MSG PM, and lab analysis revealed MSG PM's blood on appellant's clothing.

The government established appellant's motive, and ultimately his premeditation, for shooting MSG PM stemmed from adverse personnel actions recently taken against appellant. In addition to testimony from surviving members of appellant's chain of command that detailed these actions and MSG PM's role in

---

[1]
Additional Assignment of Error I

APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN DEFENSE COUNSEL DID NOT REASONABLY INFORM [APPELLANT] OF PLEA NEGOTIATIONS AND INCORRECTLY ADVISED HIM THAT THE CONVENING AUTHORITY WAS ONLY LEGALLY ABLE TO OFFER A MINIMUM OF LIFE WITHOUT PAROLE.

Additional Assignment of Error II

THE UNLAWFUL COMMAND INFLUENCE MOTION WAS NOT WAIVED, AND IF IT WAS WAIVED, THE WAIVER RESULTED FROM INEFFECTIVE ASSISTANCE OF COUNSEL.

them, multiple witnesses heard appellant state after he shot MSG PM, "I'm tired of them fucking with me."

As conceded by appellant's trial defense counsel during his opening statement, "Staff Sergeant Valmont did shoot [MSG PM]. The defense does not contest any of that." What appellant and his defense team contested was the level of appellant's mental responsibility when he shot MSG PM.

Basically, appellant's defense was twofold. First, appellant proffered he was suffering from a severe mental disease or defect at the time of the shooting, namely delirium. Because of this condition, he was unable to appreciate the nature and quality or wrongfulness of his conduct and was therefore not guilty of murder by reason of lack of mental responsibility. Second, the defense employed a partial mental responsibility theory and argued, in the alternative, that appellant committed the shooting without premeditation and therefore was only guilty of the lesser included offense of unpremeditated murder or voluntary manslaughter. Underlying both defenses was the theme that the toxic nature of appellant's command climate was a major factor in causing appellant, in a fit of rage and without premeditation, to kill MSG PM.

After the government introduced its evidence, appellant, in his case-in-chief, offered the results of the second Board convened to inquire into appellant's mental condition pursuant to Rule for Courts-Martial [hereinafter R.C.M.] 706 [hereinafter Board] and the testimony of Dr. JC (Commander, U.S. Navy), an expert in forensic psychiatry and a member of appellant's second Board. Unlike the results of his first Board, this second Board found appellant was suffering from the severe mental disease of delirium at the time of the shooting. As found in the second Board's report and as testified to by multiple witnesses at trial, appellant had recently been attempting to lose a significant amount of body fat in order to attend a military course. The second Board concluded the recent weight loss and accompanying dehydration was a likely physiological "insult" that led to appellant's delirium.

Testimony regarding appellant's attempts to lose weight prior to the shooting and the chain of command's insistence on appellant attaining a body fat percentage 3% less than the Army standard as a course prerequisite consumed quite a bit of time at trial. The defense used this evidence to not only support the delirium diagnosis but to also show that the command's efforts to enforce an arbitrary and drastic standard were proof the command environment was "toxic." Ultimately, the defense strategy was to blame the command climate in general and appellant's first-line supervisor—Sergeant First Class (SFC) TM—in particular, for driving appellant to "madness" and causing MSG PM's death. Appellant also called Dr. ES (Captain, U.S. Navy), an expert in forensic psychiatry, as a witness. Dr. ES's testimony was used to bolster the second Board's diagnosis and the reputation of its members and to also criticize how the first Board was conducted.

3

Although the second Board found appellant was suffering from delirium at the time of the shooting, it also found appellant "retained the ability to appreciate the nature and quality and wrongfulness of his actions at the time of the offenses despite impairment due to delirium." This conclusion was highlighted during the government's cross-examination of Dr. JC. Defense attempted to address this issue through the testimony of appellant's co-workers concerning his demeanor on the day of the shooting. These witnesses testified, in general, that appellant did not appear to be himself before the shooting.

In its rebuttal, the government called the doctor who conducted the first Board, Dr. BL, an expert in forensic and clinical psychology. Dr. BL testified that he did not diagnose appellant as suffering from any severe mental disorder at the time of the shooting, to include delirium, and refuted the delirium diagnosis reached by the second Board. The government also called Dr. GS to testify as an expert in general and forensic psychiatry. Dr. GS testified that he disagreed with the second Board's diagnosis that appellant suffered from delirium at the time of the shooting and agreed with Dr. BL's diagnosis. In addition, the government called other co-workers who interacted with appellant on the day of the shooting and found nothing out of the ordinary with his actions before the shooting.

## A. Ineffective Assistance of Counsel

The gist of appellant's first additional assignment of error is that he was denied his right to effective assistance of counsel based on counsel's failures with respect to pretrial negotiations. Specifically, in the affidavit appellant submitted in support of his supplemental brief to this court, he alleges:

> Near the time after the [preferral] of charges against me occurred, I met with my original civilian defense counsel, Mr. [WC]. I was informed that the government was willing to limit my confinement [to] 50 years if I pled guilty. However, when this offer was explained to me, Mr. [WC] never explained to me the mechanics of parole or how good-conduct time served could decrease the actual confinement I might have to serve.
>
> After this one vague initial discussion, I released Mr. [WC] and retained new civilian defense counsel. Although I asked them about possible deals to plead guilty, they never informed me of such discussions with the government. I asked them about a thirty year or forty year confinement cap. My new counsel informed me that if I plead guilty to murder, the statutory minimum was confinement for life with

4

> eligibility for parole.  Thus, the only deal they could even approach the government with was life with the possibility of parole.
>
> In addition to my counsel informing me of the minimum confinement sentence, after my R.C.M. 706 board, they informed me I faced around 15 years confinement because the board results were favorable to my defense.  Thus, because they advised me the minimum sentence was life with parole and I would probably only get 15 years confinement, I stopped asking them about a possible deal.

Following appellant's supplemental assignments of error, this court ordered appellant's five trial defense counsel, WC, TB, MW, Major (MAJ) JB and MAJ DH, to provide affidavits to address appellant's allegations.  We received these affidavits and supporting documents.

Mr. WC agrees with appellant's initial assertion to the extent he recalls discussing a possible pretrial agreement (PTA) with appellant and that this PTA would include a 50-year limit on confinement.  Mr. WC recalls appellant "adamantly opposed such a resolution."  While Mr. WC does not "recall specifically" whether he discussed the concept of parole or "good time" confinement reduction with appellant, he explains that in general, anytime he discussed a PTA with a client he would discuss parole and good time.

In their affidavits, Mr. TB and Mr. MW recall discussing the concepts of "good time" and parole with appellant.  Mr. MW states:

> I explained to the appellant the benefits of getting a term of years rather than a life sentence.  I explained the pros and cons and how they impacted his ability to get parole, benefits inside the prison, clemency inside the prison. The appellant understood what I said, but refused to consider a deal over 25 years.  On several occasions, he expressed his belief that he was not guilty of murder, either because he was delirious at the time or because he felt harassed by his Colonel.

In addition, Mr. TB recalls discussing with appellant the "possibility of obtaining a pretrial agreement limiting the term of confinement to 40 years" and Mr. MW recalls discussing the possibility of pleading guilty and entering into a PTA "on numerous occasions" with appellant.  Mr. TB further states that he:

> discussed the possibility of a pre-trial agreement with the

> trial counsel numerous times and was continually told that
> absolutely no offer with a term less than 50 years would
> be favorably considered . . . . Both [MW] and myself
> relayed this information back to appellant and appellant
> became hostile and informed both [MW] and myself that he
> would not sign a [PTA].  Again, [MW] and
> I discussed the potential ramifications of trying the case
> without a [PTA] and informed appellant that based on the
> evidence against him, the possibility of conviction of
> pre-meditated murder was extremely high.

After the second Board was conducted and after again discussing possible PTAs with appellant, both Mr. TB and Mr. MW discussed the possibility of a PTA with government counsel.  Government counsel maintained their position that the government would not accept a PTA that did not contain at least 50 years of confinement.  As further evidence that this conversation took place, Mr. TB submitted e-mails between defense counsel and government counsel as well as e-mails exchanged between the various defense counsel.

In reference to e-mails exchanged between defense counsel and government counsel, government counsel stated, "[i]n light of the Court's recent ruling re a mitigation expert and the 706 results, are you going to reengage [appellant] with an [Offer to Plead Guilty]/Quantum?"  In his reply, Mr. TB stated "[w]e are setting up a conference call with [appellant] to discuss a PTA, we are currently in the 40-45 year range.  Please let me know if you anticipate any issues with getting this approved – in light of the 706 findings."  The final e-mail in this series is from government counsel who stated, "[TB], Thanks for the e-mail. We have always been in the 50 year range.  How we get there doesn't matter.  If you'd like to submit 45 and we counter with 50, that's fine.  How did your conversation with [appellant] go?"

In regards to e-mails between defense counsel discussing a PTA, the first relevant exchange is a 16 April 2011 e-mail from Mr. TB to Mr. MW and MAJs (Captains at the time) JB and DH:

> [MW] and I spoke to Dr. [G] at length this week and he
> basically said that the majority of what was in the 706
> would only be used for motive and he could not get us to
> a mental responsibility defense – and he is one of the most
> defense friendly forensic psychs out there.  He was quite
> surprised at the findings and said they were "a stretch."
> That being said, [MW] and I are going to try and talk to
> [appellant] on Monday to discuss a PTA, we are
> contemplating a 40-45 year [Offer to Plead Guilty]
> with a justification memo attached for the [CA].

Mr. TB next discusses the PTA issue in a follow-up e-mail sent to the other three respective defense counsel on 19 April 2011:

> [MW], I talked to [appellant] for over an hour this morning and he stated that he will not take any [offer to plead guilty] and wants to take the case to trial. I explained that we have spoken to multiple experts and they will not support a mental responsibility defense, but he [stated] that he was [diagnosed] with delirium and was not mentally responsible at the time of the shooting. I highly recommend you give him a call and [give] him your take on this as well, I do not think a trial is in his best [interest].

In response to an e-mail authored by MAJ JB, Mr. TB sent a follow-up email:

> [MAJ JB], I completely agree with you, we are going to talk with him again about the [Offer to Plead Guilty]. I think he is foolish in his newfound desire to contest this case, especially in light of the fact that we have talked to an extremely defense friendly forensic psych who has told us that there is not enough for a mental responsibility defense. I tried to talk some sense into him again today but he was absolutely adamant about trying the case. The worst thing that could have happened here was that the 706 said he suffered from a [severe] mental defect but was not mental [sic] at the time of the shooting. Frankly, I don't think he grasps the concept, even though I spent nearly an hour explaining it, again . . . .

Major DH, while not recalling any firm PTAs being offered by the government, did recall Mr. WC discussing the possibility of a PTA that included a 50-year limitation on confinement with the appellant. She also recalled appellant was opposed to such a PTA.

Major JB recalls advising appellant to think about entering into a PTA with the government and that appellant was adamantly opposed to the concept. Major JB informally discussed a potential PTA with government counsel, but does not recall the specifics and does not recall the government offering a PTA.

In addition, included in matters submitted by appellant pursuant to R.C.M. 1105 and 1106 was an e-mail dated 1 February 2011 from government counsel to MAJs DH and JB that stated in relevant part:

7

> All I want for Xmas is an [Offer to Plead Guilty]/Quantum.
> However, Xmas is long past.  I talked to [appellant's] new
> attorney yesterday out of Hawaii.  He would like to go to
> [a guilty plea] as I'm sure the rest of us would like it too.
> With that, I'm sure you can understand that negotiations
> become much more difficult after the command spends money.

Appellant has offered no additional evidence in response to these e-mails or affidavits.

### B. Unlawful Command Influence

The issue of unlawful command influence (UCI) was first raised at trial during appellant's case-in-chief.  Staff Sergeant (SSG) NC, a co-worker of appellant's, stated she was afraid to testify at appellant's court-martial because she feared reprisal based on her unit's actions after she participated in appellant's Article 32, UCMJ, hearing. When asked what actions the unit had taken against her, SSG NC stated:

> I was moved, sir, without any documentation.  I had not
> been at the [unit] one year – six months.  And besides the
> other two reasons that were stated for them moving me I
> also was told that because of the shooting [SSG NC was
> present at the killing] that I was being moved, sir.

Staff Sergeant NC further stated she felt intimidated about testifying "[b]ecause I was told I would be moved away from my family if I didn't sign a piece of paper to be moved for the reason that I just stated."

At this point in the trial, the military judge held an Article 39(a), UCMJ, session to address this issue.  After first establishing appellant had not filed a motion for relief based on UCI, the military judge asked the defense whether they intended to file a motion alleging UCI.  In response, defense counsel stated:

> We're not raising [UCI] for the purposes of saying that
> there was – these people are all here and they're willing
> to testify.  And so the issue is not that they are no longer
> willing to testify.  This goes specifically to this issue of
> this command climate and the fear of being reprised against
> that was also in the unit.  This was the same fear we believe
> that [appellant] had and it goes directly to all the underlying
> activities leading up to the week of the shooting.

When asked by the military judge whether the defense wished to pursue a UCI motion based on the reprisal alleged by SSG NC, the defense counsel responded, "defense waives that issue so long as it's permitted to again raise this as an evidentiary issue. But in terms of a legal motion for unlawful command influence that may be raised by the defense, the defense is waiving that motion." However, a short time later, the military judge, defense and government counsel agreed to conduct additional research into whether the UCI issue was waiveable. The military judge stated that if the issue was waiveable, it had to be a free, voluntary and knowing waiver, would need involvement by the appellant in the process, and would be revisited later in the proceedings.

Staff Sergeant NC was then re-called to the stand. She again testified about being afraid to testify and spent considerable time on the stand. Her testimony included: appellant's first-line supervisor, SFC TM, micro-managed appellant and treated him poorly; appellant was normally a positive person but was worried during the week of the incident; both she and appellant had filed Inspector General complaints against the unit's commander; appellant had gotten a body wrap the week of the shooting in order to lose weight; and on the day of the shooting appellant had bloodshot eyes and was not acting normally, to the extent that she informed multiple members of the unit that something was wrong with appellant.

After SSG NC was excused, the military judge again stated defense counsel and appellant needed to decide how they wanted to proceed with respect to the UCI allegations and established when the issue would be litigated.

Ms. ML, a co-worker of appellant's, was then called to testify as a defense witness. Contrary to argument contained in appellant's supplemental brief,[2] Ms. ML's testimony was that the unit commander had retaliated against her and others based not upon anything concerning the shooting but instead upon an administrative complaint she had filed against the commander through "the union." A hearing into this allegation was held in November 2010, eight months before the shooting. The gist of the remainder of Ms. ML's testimony was that the command climate was toxic and that appellant was normally a happy person but on the day of the shooting was not himself.

---

[2] Appellant's supplemental brief alleges that Ms. ML "received pressure from the command" based on her association with appellant during the court-martial process and that "after the shooting, [Ms. ML] testified that she also received reprisals from the command after identifying [appellant] as a witness regarding her administrative employment hearing." However, per Ms. ML's testimony, the administrative hearing occurred eight months *prior* to the shooting.

At the end of Ms. ML's direct testimony, she stated she was afraid to testify at appellant's trial because:

> I am scared of Colonel [DK], very scared of Colonel [DK], very, because he's made it known that he personally takes my folder home and Major [MB]'s folder home. And I can't say what he's said to others, but he's made – I know that he's done a lot to me and he's intimidated me. So I just really – just being in this building right now, I know he's in this building and it's kind of frustrating. It's real bad. I know he's in here and I'm not trying to look around in this room, but I know he's in this building. And it's just too much for me.

Major MB, another of appellant's co-workers, testified next for the defense and stated the command climate was very stressful and hostile. She alleged she was harassed by the unit commander before the shooting because she had to report to him in the morning, afternoon and evening. Consequently, before the shooting, MAJ MB filed a complaint against the commander for harassment and unfair treatment and felt retaliated against for making that complaint.[3] She never heard anything back regarding her complaint. In addition, MAJ MB testified that appellant was generally an "upbeat" person, but on the day of the shooting, he did not appear normal.

An additional co-worker then testified that the command climate was toxic and stressful and that on the day of the shooting appellant looked like "the seven headed dragon" had taken him over. Then, Ms. MS, a licensed social worker who treated appellant and other members of the unit, testified the unit work environment appeared so stressful she wrote a letter inquiring into the matter. After Ms. MS testified, the military judge again addressed the UCI issue with defense counsel:

> MJ: While we were talking about it during [an R.C.M. 802 conference] prior to meeting today I raised again the issue of UCI and Defense, you indicated . . . two things. Just tell me if it's true. That you do not believe although there may be evidence of UCI in the terms of what happened to [SSG NC] post-32, would it be fair to say you do not believe that impacted your ability to present your case?

---

[3] Appellant in his brief again mischaracterizes testimony by alleging MAJ MB testified she "received reprisals from the unit commander *after* the shooting because of her association with appellant."

Civilian Defense Counsel 1 [CDC 1]:  That's correct your honor.

MJ:  OK.  And you've been able to have access to witnesses and witnesses you have access to for looking into it [sic].  There are – the ones you want are cooperating with you and will testify as you want?

CDC1:  Your honor, every witness that we needed for trial either to speak with in an interview or call to testify we have been able to speak with or contact.

MJ:  So if there had been any UCI it had no impact on this trial?

CDC1:  That's correct, sir.

MJ:  And therefore you do not wish to raise the issue?

CDC1:  That's correct, your honor.

MJ:  Okay.  You've discussed this with your client?

CDC1:  We have at length.

MJ:  Okay.  Staff Sergeant Valmont, unlawful command influence is a serious issue.  It can be somewhat complicated for lawyers and judges for that matter.

ACC:  Yes sir

MJ:  Okay.  And I don't want to go into the extent of those discussions, but talking to your attorneys do you feel that you understand what this issue is about?

ACC:  Yes sir.

MJ:  Okay.  And what could possibly happen if you did raise it and were successful?

ACC:  Yes sir.

MJ:  After discussing it with your attorneys do you have any questions about what unlawful command influence is

or the facts in this case that at least from your perspective
may give rise to it?  Do you have any questions?

ACC:  No sir.

. . . .

MJ:  Are you convinced that despite any unlawful
command influence that may have occurred in this case,
you have been able to present all witnesses and evidence
and present a full defense in this case?

ACC:  Yes sir.

MJ:  Okay.  And accordingly do you agree with your
attorneys' decision that you do not wish to pursue this
issue any further during this trial?

ACC:  Yes sir.

MJ:  I find the accused has made a knowing, voluntary and
intelligent – I'm not going to say waiver because there
may not even be an issue here, but decision not to pursue
any allegation of unlawful command influence at this trial.

On rebuttal, the government called Sergeant Major BS who generally refuted the allegations made by SSG NC, MAJ MB and Ms. ML.

**LAW AND DISCUSSION**

*A. Ineffective Assistance of Counsel*

*1. Failure to Communicate Formal Pretrial Offers*

Claims of ineffective assistance of counsel in the plea bargain context are governed by the two-part test set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  *See Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985).  The two-part test found in *Strickland* requires appellant to demonstrate: (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice.  *Strickland*, 466 U.S. at 687.

The relatively recent Supreme Court decision in *Missouri v. Frye*, 132 S. Ct. 1399 (2012), is particularly relevant to appellant's case.  In a 5-4 decision, the Supreme Court held that: "[A]s a general rule, defense counsel has the duty to

communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 132 S. Ct. at 1408.

Therefore, appellant's allegation of ineffective assistance of counsel (IAC) initially fails based on a lack of evidence to find the government made a formal plea offer. E-mails, to include those from government counsel, and statements from multiple defense counsel support a finding that government counsel only engaged in informal discussions with defense counsel concerning a possible PTA. It is also apparent that both defense and government counsel understood that any formal PTA would need to originate with appellant and would not be supported by the staff judge advocate or approved by the CA unless it contained no less than a 50-year limitation on confinement.

In addition, even assuming these informal discussions could be construed as a formal plea offer, appellant concedes his original defense counsel, Mr. WC, discussed with him the possibility of entering into a PTA that included a 50-year limitation on confinement. Appellant's allegation of IAC does not assert a lack of communication regarding potential plea deals, but rather contends he was not fully informed by Mr. WC on the impact of parole and "good time" on a 50-year sentence to confinement. An IAC finding in this case, when appellant admits he was informed about a potential plea deal but not about collateral parole matters, would necessitate extending *Frye* well beyond the scope of its narrow holding. *Id.*

However, this issue is itself mooted based on conversations Mr. MW and Mr. TB had with appellant wherein they discussed parole and "good time" in detail. Appellant has not refuted those accounts. As such, the record reflects appellant was on notice as to the "real time" associated with a 50-year confinement limitation.

Given there is no indication government counsel ever offered support for a PTA that included less than a 50-year confinement limitation, and no indication appellant ever intended to accept a PTA that included a 50-year limitation, the rest of appellant's allegation concerning internal defense discussions including a 30 or 40 year confinement cap, is irrelevant per *Frye*. As such, pursuant to *Strickland*, we find appellant has not established a prima facie case of IAC because he has neither (1) established deficient performance by any of his counsel; nor (2) made a colorable showing of possible prejudice.

### 2. Advice on Maximum Sentence to Confinement

Appellant also alleges that counsel were ineffective because they incorrectly advised him concerning the minimum punishment associated with a guilty plea to a murder charge. In conducting this review, we will again utilize the *Strickland* standard and apply a "strong presumption" that trial defense counsel were competent. *United States v. Grigoruk*, 56 M.J. 304, 308 (C.A.A.F. 2002).

13

Appellant, in his post-trial affidavit, specifically alleges his civilian defense counsel, Mr. MW and Mr. TB, "informed me that if I pled guilty to murder, the statutory minimum was confinement for life with eligibility for parole. Thus, the only deal they could even approach the government with was life with the possibility of parole."[4] This erroneous advice concerning the unavailability of a PTA that included a term of years to confinement[5] was allegedly a major factor in appellant's decision not to agree to a PTA and represented deficient performance on the part of his counsel. "[W]here the accused has been grossly misled by a miscalculation or erroneous sentence estimation by defense counsel, such conduct may constitute [IAC]." *United States v. St. Blanc*, 70 M.J. 424, 428 (C.A.A.F. 2012) (internal citations omitted).

In response to appellant's allegations, Mr. MW and Mr. TB submitted post-trial affidavits that detail numerous discussions with appellant concerning possible PTAs. Both Mr. MW and Mr. TB implicitly refute appellant's allegations that they told appellant the CA could only approve a PTA that included a period of confinement for life with the possibility of parole because both recall urging appellant to offer and ultimately accept a PTA that contained a 40-year term of confinement.

Because appellant and counsel have filed conflicting post-trial affidavits, we have analyzed whether a post-trial evidentiary hearing is required. *United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997). After applying the fourth *Ginn* principle, we find such a hearing is not required. *Id*. at 248. Assuming appellant's affidavit is factually adequate on its face, "the appellate filings and the record as a whole 'compellingly demonstrate' the improbability of those facts" and therefore we may "discount those factual assertions and decide the legal issues." *Id*.

---

[4] Appellant's supplemental brief initially alleges that defense counsel informed appellant, regarding a guilty plea to murder, that the CA "was only legally able to offer a minimum of life *without* parole." After repeating this allegation a few times, appellant's brief then states the alleged error was advising appellant the CA could only approve a minimum confinement period of life *with* the possibility of parole. Because appellant's affidavit only supports the latter allegation, this is the allegation we will address.

[5] At the time of appellant's trial, in accordance with R.C.M. 1107(d)(2), and Article 56a(b), UCMJ, although a premeditated murder conviction, under Article 118(1), includes a mandatory minimum confinement period of life with the possibility of parole, the CA can approve a lesser sentence as part of a PTA or through his post-trial clemency authority.

Prior to retaining Mr. TB and Mr. MW, appellant was informed by his first civilian counsel, Mr. WC, that the government "was willing to limit my confinement at 50 years if I pled guilty." Appellant, per his affidavit, admits this conversation took place. Mr. WC and MAJ DH, in their affidavits, remember this conversation taking place. In addition, MAJ JB avers that when he was the lead attorney in appellant's case, he "explained to [appellant] that due to the overwhelming evidence in the case he needs to think about the possibility of entering into an agreement with the Government to reduce any potential sentence to a term of years." Appellant has not addressed MAJ JB's statement.

Appellant offers no explanation as to why he would discount the guidance he received from Mr. WC and MAJ JB and end up being misled by erroneous guidance that he allegedly received from Mr. TB and Mr. MW. The improbability of that eventuality is heightened by MAJ JB's continued representation of appellant throughout the process and his availability to address the alleged misleading information provided by Mr. TB and Mr. MW.

In making our decision, we find particularly illuminating the e-mails previously identified in this opinion. These e-mails demonstrate that on or about 16 April 2011, Mr. MW and Mr. TB were planning on discussing a PTA with appellant that included a term of years (40-45). One of these e-mails was sent to government counsel to establish that the 40-45 year range was reasonable. On 19 April 2011, per Mr. TB, appellant stated he would "not take any [offer to plead guilty] and want[ed] to take the case to trial." It is reasonable to conclude the PTA discussed and rejected by appellant on 19 April 2011 included a term of confinement in the 40-45 year range.

In sum, while appellant's affidavit alleges erroneous advice about mandatory punishments that could constitute ineffective assistance of counsel if true, the record as a whole and the appellate filings compellingly demonstrate the improbability of those facts. *See Ginn*, 47 M.J. at 248. Thus, under *Ginn*, this court discounts appellant's factual assertions and finds appellant has failed to demonstrate that counsel's performance was deficient. *See Strickland*, 466 M.J. at 687; *Ginn*, 47 M.J. at 248.

### B. Unlawful Command Influence

Article 37(a), UCMJ, prohibits UCI. Witness interference can constitute UCI. *See United States v. Douglas*, 68 M.J. 349, 354 (C.A.A.F. 2010); *United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F. 2004); *United States v. Stombaugh*, 40 M.J. 208, 212-13 (C.M.A. 1994); UCMJ art. 37.

Appellant initially argues we should not apply waiver to his UCI allegation even though his trial defense team, and appellant himself, were aware of this issue at

trial and affirmatively decided not to pursue it. Because the alleged UCI in this case occurred during the adjudicative stage in the proceedings, and the law is not entirely clear in this area, we agree with appellant and will not apply waiver to this issue. *See Douglas*, 68 M.J. at 356 n.7; *United States v. Johnston*, 39 M.J. 242, 244 (C.M.A. 1994); *see also United States v. Weasler*, 43 M.J. 15, 17-18 (C.A.A.F. 1995); *United States v. Reynolds*, 40 M.J. 198 (C.M.A. 1994).

On a UCI claim on appeal, appellant must first establish: "(1) facts, which if true, constitute [UCI]; (2) that the proceedings were unfair; and (3) that the [UCI] was the cause of the unfairness." *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citation omitted). "[T]he initial burden of showing potential [UCI] is low, but is more than mere allegation or speculation." *Id.* (citing *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002)). Specifically, appellant must show "some evidence" of UCI. *Id.* In addition, allegations of UCI are reviewed for actual UCI as well as the appearance of UCI. *Id.*

Our superior court has further held that "prejudice is not presumed until the defense produces evidence of proximate causation between the acts constituting [UCI] and the outcome of the court-martial." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999).

In evaluating whether appellant has met his initial burden, we first note his present claim is premised upon the same trial testimony that appellant's trial defense counsel and appellant himself did not deem worthy of supporting the very complaint he now lodges. Although appellant now characterizes this testimony as "overwhelming evidence of actual and apparent UCI," we find it much less compelling.

At trial, the only testimony identified as potentially supporting an allegation of UCI was that of SSG NC, specifically that she had faced reprisal in the form of an unwanted unit transfer for testifying on appellant's behalf at his Article 32 hearing. On appeal, appellant now alleges that according to their testimony, Ms. ML and MAJ MB "received pressure from the command for their association with [appellant] during the court-martial process."

As captured above, Ms. ML's testimony was that although she was generally afraid of the unit commander, her allegation concerning reprisal was that the unit commander retaliated against her and witnesses who testified on her behalf at an administrative hearing because she filed a complaint against the commander through "the union." This alleged reprisal had nothing to do with appellant's court-martial.

Likewise, MAJ MB testified she was harassed by the unit commander before the shooting because she had to report to the commander in the morning, afternoon and evening. Major MB filed a complaint against the commander for that

harassment and unfair treatment. She then complained again concerning perceived reprisal for making the original complaint. All this transpired before the shooting and had nothing to do with appellant's court-martial.

Assuming, therefore, that SSG NC's allegations, if true, constituted UCI, we are left to decide whether appellant's court-martial proceeding was unfair, and whether the assumed reprisal against SSG NC was the cause of the unfairness.

At trial, appellant's defense counsel plainly stated this alleged reprisal had no impact on his ability to present his case: "Your honor, every witness that we needed for trial either to speak with in an interview or call to testify we have been able to speak with or contact." Based on our own review of the record, we conclude this alleged reprisal against SSG NC had no impact on appellant's trial. Because SSG NC testified extensively at trial, it is illogical to now claim that she was somehow influenced not to provide the defense-favorable testimony that she, in fact, provided.

In addition, numerous witnesses testified on appellant's behalf as to his demeanor on the day of the shooting and as to the toxic command environment present at the time of the shooting. This testimony supported the defense's strategy that the command drove appellant to involuntarily shoot MSG PM and that appellant therefore lacked the requisite *mens rea* to support a premeditated murder conviction. Contrary to appellant's allegations, there is no evidence his ability to call witnesses was impeded, to even the slightest degree, by any command action. As such, we do not find that appellant has met his burden to show that his proceedings were unfair, let alone establish that any unfairness was caused by UCI.

## CONCLUSION

On consideration of the entire record, and the assigned errors, to include matters personally raised by appellant pursuant to *Grostefon*, 12 M.J. 431, we hold the findings of guilty and the sentence as approved by the convening authority correct in law and fact. Accordingly, the findings of guilty and the sentence are AFFIRMED.

Judge TELLITOCCI and Judge HAIGHT concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

17