# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
HAIGHT, PENLAND, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Private E1 BRYANT K. MARSH**
**United States Army, Appellant**

ARMY 20120572

Headquarters, 82d Airborne Division
Tara A. Osborn, Military Judge
Lieutenant Colonel Paul J. Cucuzzella, Staff Judge Advocate (pretrial)
Colonel John N. Ohlweiler, Staff Judge Advocate (recommendation)

For Appellant:  William E. Cassara, Esq. (argued); Captain Payum Doroodian, JA; William E. Cassara, Esq. (on brief).

For Appellee:  Captain John Gardella, JA (argued); Major John K. Choike, JA; Captain John Gardella, JA (on brief).

31 May 2016

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

WOLFE, Judge:

A general court-martial composed of officer members convicted appellant, contrary to his pleas, of one specification of willfully causing over $500 of damage to military property, one specification of willfully causing less than $500 damage to military property, one specification of rape, and one specification of aggravated sexual assault, in violation of Articles 108 and 120, Uniform Code of Military Justice, 10 U.S.C. §§ 908 and 920 (2006 & Supp. IV 2011) [hereinafter UCMJ].  The court-martial sentenced appellant to a dishonorable discharge, confinement for twenty years, and forfeiture of all pay and allowances.  The convening authority approved the dishonorable discharge and total forfeitures, but only approved nineteen years and three months of confinement.  Appellant was credited with 259 days of confinement credit.

Appellant's case was referred to this court for review pursuant to Article 66(b), UCMJ. Appellant assigns five assignments of error, four of which merit discussion, and two of which merit relief.[1] Appellant personally submitted three issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982) which do not warrant additional discussion or relief.

## I. BACKGOUND

The surrounding circumstances of appellant's offenses and the pretrial errors discussed below all took place while appellant had been returned to active duty pending a sentence rehearing for an unrelated court-martial.[2]

On 21 November 2011, Private First Class (PFC) JCL had a party at her off-post apartment to celebrate her 21st birthday. Appellant arrived with three other junior enlisted soldiers. At the party, PFC JCL became heavily intoxicated. Pictures of the party introduced by the government show PFC JCL drinking tequila from the bottle and asleep on a couch with a liquor bottle still in her hand. She testified that after she had fallen asleep, appellant woke her up and encouraged her to "have one more shot." After having one more shot, she again fell asleep on the couch. Waking up on her own, PFC JCL then began to have a significant verbal altercation with one of her guests, a former girlfriend. As the argument spilled outside, all the guests left the party except for appellant. Appellant declined a ride home from other guests, stating that he had a ride from "one of his friends or his baby's mama."

Private First Class JCL testified that after returning inside, she had one final shot of alcohol, left appellant alone on the couch, and then went into her bedroom where she fell asleep. She testified that she then remembered waking up to appellant

---

[1] Appellant's third assignment of error asserts that the trial counsel committed prosecutorial misconduct by providing false information to appellant's brigade commander and to Criminal Investigative Command (CID) concerning the case. We find this matter was forfeited at trial. Additionally, it is far from clear that the emails, sent during the initial stage of the investigation were knowingly false or misleading. Finally, we are unable to discern any prejudice to appellant.

[2] At a general court-martial that concluded in May 2008, appellant was acquitted of rape but convicted of making a false official statement. The court-martial sentenced appellant to a bad-conduct discharge, forfeiture of $1347.00 of pay for one month, and to be reduced to the grade of E-1. The United States Court of Appeals for the Armed Forces ordered a sentence rehearing based on an improper sentencing argument by the trial counsel. *See United States v. Marsh*, 70 M.J. 101, 107 (C.A.A.F. 2011). At the rehearing, appellant was sentenced to be reduced to the grade of E-1.

in her bed and between her legs asking her "how tight is it?" She understood appellant to be asking her for sex. She told appellant "no" and then "passed out."

Private First Class JCL's next memory was waking up to find that appellant was penetrating her vagina with his penis. It was now morning and she was naked. Private First Class JCL then tried to push appellant off of her, but appellant lowered his weight onto her so that she couldn't move. After failing to push him off, and unable to move, PFC JCL testified she just looked out the window until appellant finished. Private First Class JCL told the court-martial that as appellant rolled off of her, she got up, got dressed, and after waiting a bit on the couch to sober up, drove herself to the hospital and reported that she had been sexually assaulted. Swabs taken from PFC JCL during a sexual assault exam showed DNA consistent with appellant's DNA.

Private St. Cyr was one of the other soldiers who attended the party. He had previously hung out and was friendly with both PFC JCL and appellant. After hearing that PFC JCL had been assaulted, Private St. Cyr and one other soldier returned to PFC JCL's apartment. He found appellant still in PFC JCL's bed. He testified that he then told appellant to get dressed. As Private St. Cyr and appellant were leaving the apartment—and without any warning—Private St. Cyr hit appellant in the jaw, knocking him to the ground. The two soldiers then began to wrestle on the ground with Private St. Cyr ending up on top of appellant, who was face down on the ground. Private St. Cyr testified the following exchange then took place:

> Appellant: "What the f**k. What are you doing?"
>
> Private St. Cyr: "Ni**er you know what you did."
>
> Appellant: "I don't know what you are talking about."
>
> Private St. Cyr: "You know what you did."
>
> Appellant: "[JCL]?"
>
> Private St. Cyr: "[JCL]. You know what you did."
>
> Appellant: "Oh, my God. Dude, I did not rape that girl."
>
> Private St. Cyr: "Well, it doesn't matter to me and you are going back to the barracks regardless."

3

Private St. Cyr further testified that on the drive back, appellant called the military police to inform them he had been accused of rape and asked them to meet him at the barracks.[3]

Just over two weeks later, appellant trashed his barracks room. Appellant threw exercise equipment into a wall and door and also set fire to a table in his room. Noncommissioned officers (NCOs) responding to the commotion and smoke found appellant drunk and despondent. Appellant refused to allow entry and attempted to close the windows to his room in order to keep the smoke inside. Staff Sergeant Humphries, the first NCO on the scene, overpowered and subdued appellant. He described appellant as appearing suicidal.

The government introduced pictures of the damage to appellant's room which included a table with a scorched surface and substantial damage to the walls. Testimony described damage to two doors, but the testimony also indicated that some of the damage to the doors had been caused by the responding firefighters. The government introduced evidence on the cost to replace or fix the table, doors, and walls.

---

[3] Appellant did not object to this testimony either at trial or on appeal. We find this testimony requires a brief discussion:

In closing argument, the trial counsel argued that when appellant was told "you know what you did," appellant's jump to the assumption of "rape" indicated consciousness of guilt. Additionally, the trial counsel argued that appellant's desire to self-report to the military police was an attempt to "get ahead" of the story.

Under Military Rule of Evidence 304(a), an involuntary statement made by an accused may not be introduced against him at trial "if the accused makes a timely motion to suppress." "In the absence of such a motion or objection, the defense may not raise the issue at a later time except as permitted by the military judge for good cause shown." Mil. R. Evid. 304(d)(2). A statement is "involuntary" if, *inter alia*, it is made "through the use of coercion." Mil. R. Evid. 304(c)(3). Private St. Cyr's questioning, while appellant was face down on the ground immediately after being sucker-punched, raises the issue of whether appellant's statements in response were coerced. However, as there was no motion to suppress or other objection, this issue was forfeited. Additionally, given that appellant's statements were facially exculpatory, we do not see plain error or deficient performance by counsel. Finally, we note that the lack of a motion or objection deprives us of a developed record where arguments and evidence would have been subject to adversarial testing. Accordingly, while we note this issue, we do not order relief.

## II. DISCUSSION

### A.  *Factual Sufficiency – Willfully Damaging Military Property*

In his first assignment of error, appellant alleges that the evidence was legally and factually insufficient to support Specification 1 of Charge II.[4]  In that offense, appellant was charged with willfully damaging military property by throwing exercise equipment through a door and walls.

In reviewing the evidence in this case, we find ourselves with two problems. First, it appears from the record that two doors were damaged, and one of the doors was at least partly damaged by responding firefighters.  There is factually insufficient evidence in the record to support that appellant *willfully* caused the firefighters to damage the door.  Second, we find that there is factually insufficient evidence in the record for us to determine *which* door was damaged by appellant alone.  Or, to the extent that the record supports that appellant damaged both doors willfully, which damage was attributable to appellant's willful conduct and which was caused by the firefighters.  Accordingly, we will approve only so much of the finding that addresses appellant's willful damage to the walls in his barracks room. As this action reduces the amount of damage to less than $500, we will also only approve a finding that properly reflects the amount of damage appellant caused.[5]

### B. *Improper Pretrial Confinement*

In his second assignment of error, appellant alleges that his court-martial was tainted by unlawful command influence (UCI) when his battalion commander improperly "forced" the company commander into placing appellant in pretrial confinement.

---

[4] In his first assignment of error, appellant claims the evidence is legally and factually insufficient to support all charges and specifications.  With the exception of Specification 1 of Charge II, we disagree.

[5] We acknowledge that there are two separate actions we could take given these circumstances.  We could find appellant guilty of the lesser-included offense of negligently causing over $500 of damage to the walls and doors (under the theory that appellant was at least negligent in causing the responding firefighters to damage the door).  Alternatively, we could except out that part of the specification alleging damage to the doors and find appellant guilty of willfully causing some damage (less than $500) to his barracks room wall.  Both results provide for the same maximum punishment.  *See Manual for Courts-Martial, United States* (2008 ed.) [hereinafter *MCM*, 2008], pt. IV, ¶ 32.e.  The latter course of action is more consistent with the facts in the record and appellant's actions.

### 1. Motions Practice

On 10 April 2012, appellant's defense counsel filed a motion alleging that the charges had been improperly preferred by appellant's company commander, Captain (CPT) Beatte. The motion was brief, running just over a page in length, and argued that preferral was improper as CPT Beatte did not actually believe there was probable cause to prefer the charges.

At a subsequent Article 39(a), UCMJ, session, CPT Beatte testified that while she had some initial misgivings as the case was being investigated, by the time she swore out charges she believed there was probable cause to support the charges. She repeated this testimony on direct, during cross-examination, and while being questioned by the military judge.

While CPT Beatte was adamant that the preferral had been proper, she was equally candid that her decision to place appellant into pretrial confinement had been wrong. She testified that she didn't "want" to place appellant in confinement. When asked, "how does [appellant] end up in pretrial confinement if you didn't want it?" she responded, "I did feel some pressure from Lieutenant Colonel [LTC] Arnold [appellant's battalion commander and her immediate higher commander] to put him in pretrial confinement." Ultimately, CPT Beatte agreed with the defense counsel's characterization that she felt "forced" to place appellant in pretrial confinement. No one asked CPT Beatte why she felt forced. That is, there is no evidence of what was said or done to *influence* her. At the end of the hearing, the defense counsel argued that CPT Beatte was not credible and that "[u]nder the totality of the circumstances, I don't think that we have enough to believe that, at that time [when she preferred charges], she believed she had probable cause."

The only reference to unlawful command influence (UCI) during the hearing was a passing reference by the trial counsel during argument.

The military judge ruled on the defense motion of a defective preferral in short order. The military judge made numerous findings of fact, including that "CPT Beatte believed there was enough evidence to prefer charges against the accused . . . ." After accounting for the evidence that CPT Beatte had considered, the military judge concluded, "[a]t the time she preferred charges against the accused, CPT Beatte believed that the matters set forth in the charges were true." Finally, the military judge found that CPT Beatte "was not forced, coerced, or instructed to prefer charges."

The day after the military judge's ruling, appellant's defense counsel filed a motion for appropriate relief asking the military judge to direct that appellant be released from pretrial confinement. The motion, which again was less than two pages long (including the caption and signature block), argued that as "the

requirements of R.C.M. 305(d) have not been satisfied . . . [appellant] should be released from pretrial confinement." The motion did not allege UCI.

At a subsequent Article 39(a), UCMJ, session, the military judge took up the motion to release appellant from confinement. Prior to taking evidence, the military judge confirmed with the defense that they had received previously requested emails between the trial counsel, CPT Beatte, and LTC Arnold. The defense counsel confirmed they had received the emails but did not introduce them into evidence.

At the hearing, CPT Beatte testified that on 6 December 2011, when she ordered appellant into confinement, she did not believe that confinement was warranted as lesser forms of restraint were not inadequate. She testified, "I did feel some pressure from Lieutenant Colonel Arnold to put [appellant] in pretrial confinement." She further testified that she "felt like it would negatively impact my command if I did not put him in pretrial confinement." Again, no one asked CPT Beatte what LTC Arnold had said or done to make her feel this way.

However, notwithstanding CPT Beatte's testimony that her initial decision to place appellant into confinement was wrong, she testified that by 30 January 2012, confinement was warranted. On that date, CPT Beatte preferred additional charges against appellant. In other words, while CPT Beatte did not believe confinement was warranted between 8 December 2011 and 30 January 2012, after that date she felt the confinement was in fact warranted.

As in the first motions session, appellant did not raise the issue of UCI.[6]

The military judge denied the defense motion to release appellant. While the military judge found that CPT Beatte erred in ordering appellant into confinement on 8 December 2011, she also found that the error ceased to exist on 30 January 2012, when CPT Beatte preferred additional charges against appellant and determined pretrial confinement was warranted. The military judge ordered that appellant be credited with an additional fifty-three days of confinement pursuant to Rule for Courts-Martial [hereinafter R.C.M.] 305(k).

---

[6] Government trial counsel did, however, address the issue of UCI in both their motion in response to the defense motion to release appellant from pretrial confinement and in their argument to the military judge.

## 2. Analysis

As an initial matter, we determine that appellant has forfeited the issue he now asserts on appeal.[7]

An accused forfeits claims of accusatory UCI if not raised at trial. *United States v. Drayton*, 45 M.J. 180 (C.A.A.F. 1996).[8]

In the defense's first motion, appellant argued that preferral was defective because CPT Beatte preferred charges without believing that the charges were true. However, when called as a witness CPT Beatte's testimony did not support the defense's motion. The military judge ruled on the motion in front of her and properly rejected the defense's claim. Next, the defense moved to have appellant released from confinement. Again, the military judge ruled on the motion in front of her. The military judge found that appellant had been improperly confined for fifty-three days and awarded credit pursuant to R.C.M. 305(k). The defense motion never raised the issue of UCI, forfeiting the issue. The only party to specifically address UCI in any depth was the government, who when responding to the defense's motion to release appellant from confinement wrote:

> The [g]overnment cannot ascertain the nature of the [d]efense's argument. The [g]overnment is unsure if the [d]efense is asserting probable cause did not exist or that there was some type of disqualification of CPT Beatte regarding ordering the [a]ccused into pretrial confinement. Assuming the [d]efense is alleging unlawful command influence . . . .

The defense, by failing to raise the issue of accusatory UCI to the military judge, forfeited the issue.

---

[7] We note that the government conceded in its brief that the defense had preserved the issue of UCI. For the reasons stated below, we reject that concession.

[8] Although the *Drayton* court uses the term "waiver," 45 M.J. at 182 n.2, for consistency and in fidelity to our superior court's opinion in *United States v. Gladue*, we will use the term "forfeiture." 67 M.J. 311, 313 (C.A.A.F. 2009) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.' The distinction between the terms is important. If an appellant has forfeited a right by failing to raise it a trial, we review for plain error. When, on the other hand, an appellant intentionally waives a known right, it is extinguished and may not be raised on appeal."). (internal citations and quotations omitted).

Alternatively, to the extent that the defense motion on a defective preferral implicitly preserved the issue of UCI, then we are also convinced that appellant is not entitled to relief. At trial, "the accused must show facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999).[9] Here, the defense motion speculated that CPT Beatte did not "believe there was enough evidence to warrant preferral." While the threshold for raising UCI is low, it is "more than mere allegation or speculation." *Biagase*, 50 M.J. at 150.

The evidence introduced did not support that the preferral decision had been influenced by any UCI. The military judge's findings in that regard were well supported by the evidence. To the extent that this is a controverted question of fact, *see* Article 66(c), UCMJ, we adopt the military judge's findings. Finally, even assuming that the burden had shifted to the government, the government "show[ed] that there was no unlawful command influence" in the preferral decision. *Id.*

To the extent that appellant claims he is entitled to relief because there was UCI in the decision to place him into pretrial confinement—even though that influence did not affect the preferral, transmittal, referral, or court-martial proceedings—we disagree. Put differently, we do not believe improper influence in a pretrial confinement decision can constitute UCI if the influence did not somehow infect the preferral, referral, or the court-martial. First, we must again note that the record is undeveloped on this point because of the failure to specifically raise the issue of UCI. It is unclear what caused CPT Beatte to feel "forced" or "pressured" to place appellant in pretrial confinement. The emails between the trial counsel,

---

[9] At oral argument before this court, the government argued that in the case of accusatory UCI, *Biagase* is inapplicable as accusatory UCI does not raise the same constitutional issues as adjudicative UCI. We agree that the differences between accusatory and adjudicative UCI are differences *in kind* that may warrant different treatment. That is why, for example, accusatory UCI may be forfeited or waived while adjudicative UCI has been held to be unwaivable. *Compare United States v. Weasler*, 43 M.J. 15, 19 (C.A.A.F. 1995) (allowing waiver of accusatory UCI) *with United States v. Valmont*, 73 M.J. 923, 932-33 (Army Ct. Crim. App. 2014) (declining to apply waiver to adjudicative UCI) and *United States v. Hamilton*, 41 M.J. 32, 37 (C.M.A. 1994) ("Unlawful command influence at the referral, trial, or review stage is not waived by failure to raise the issue at trial."). However, lacking a better framework with which to address the issue, and as the result would be the same regardless, we evaluate the accusatory UCI issue in this case through the more exacting lens crafted in *Biagase*.

9

CPT Beatte, and LTC Arnold were specifically not introduced by the defense in support of the motion.[10]

Second, we find matters of accusatory UCI are limited to the accusatory process. *See Hamilton*, 41 M.J. at 36 ("It is necessary, however, to determine whether the allegation of unlawful command influence in a particular case pertains to the preferral of charges, forwarding of charges, referral, trial, or post-trial review, in order to determine the applicable rules of law."). If a commander's improper actions do not affect the preferral, transmittal, referral, trial, or post-trial processing of a case, the remedy likely lies elsewhere. Here, as the procedures for pretrial confinement were violated, the military judge properly awarded appellant confinement credit in accordance with R.C.M. 305(k).

*C. Unreasonable Multiplication of Charges*
*Rape and Aggravated Sexual Assault*

In appellant's fourth assignment of error he alleges that the specifications of rape and aggravated sexual assault are unreasonably multiplied for findings.[11]

---

[10] At least some of the emails were included by appellant as part of his submissions under R.C.M. 1105. The emails demonstrate that LTC Arnold was concerned that CPT Beatte was reluctant to order appellant into confinement. He then separately asked the trial counsel whether he "could order her to do so or is that undue influence?" He further asked what legal courses of action were available. The trial counsel advised in response that LTC Arnold could order appellant into confinement if CPT Beatte did not and that any officer could order appellant into confinement. That is, the emails do not support an inference of improper influence but instead demonstrate an awareness of the problems with UCI and possible courses of action. However, for us to consider the emails under these circumstances would be problematic. First, strictly speaking, the emails are not part of the record of trial. *Compare* R.C.M. 1103(b)(2) ("Contents" of the record) *with* R.C.M. 1103(b)(3) ("Matters attached to the record"). In general, when determining questions of legal error at trial, we do not consider facts obtained from outside of the record. For example, for these exact reasons we do not consider appellant's admissions in his R.C.M. 1105 matters that he caused $1201 in damage to his barracks room. Second, the record reveals that it was a tactical decision by the defense not to admit the emails. Third, and relatedly, the defense was free to submit under R.C.M. 1105 only those emails which best supported his pleas for clemency. It would be speculation to assume that appellant submitted all emails relevant to the decision to place appellant in pretrial confinement. Finally, neither party's briefs asked us to consider them on appeal.

[11] The military judge granted the defense's motion to treat the specifications as one for purposes of sentencing.

As an initial matter, we find that appellant forfeited this issue by not raising it at trial. In *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001), our superior court made clear that courts of criminal appeals are "well within [their] authority to determine the circumstances, *if any*, under which [they] would apply waiver or forfeiture" to issues of unreasonable multiplication of charges. (emphasis added). That is, while we have "awesome, plenary, *de novo* power" to recognize waived and forfeited issues, such recognition is not required and is certainly not always wise. *Id*. (citation and internal quotation marks omitted); *see also United States v. Chin*, 75 M.J. __, 2016 CAAF LEXIS 312, at *8 (C.A.A.F. 26 Apr. 2016) ("[T]he CCAs are required to assess the entire record to determine whether to leave an accused's waiver intact, or to correct the error").

However, even applying the *Quiroz* framework to this case, as requested by appellant, would not result in relief. Applying *Quiroz* requires examination and analysis of five questions:

> (1) "Did the accused object at trial that there was an unreasonable multiplication of charges and/or specifications?"; (2) "Is each charge and specification aimed at distinctly separate criminal acts?"; (3) "Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?"; (4) "Does the number of charges and specifications [unreasonably] increase the appellant's punitive exposure?"; and (5) "Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?"

*Quiroz*, 55 M.J. at 338 (quoting *United States v. Quiroz*, 53 M.J. 600, 608 (N.M. Ct. Crim. App. 2000)). As discussed above, as there was no objection at trial, the first factor weighs heavily against finding an unreasonable multiplication of charges for findings.

The second factor—is each charge and specification aimed at distinctly separate criminal acts—is a factually nuanced inquiry. The alleged theory of aggravated sexual assault was that appellant committed a sexual act with PFC JCL while she was incapacitated. The rape specification on the other hand alleged a sexual act by force.

Private First Class JCL testified that she awoke to appellant having sex with her. Once awake, it is clear that PFC JCL knew what was happening to her. When PFC JCL tried to push appellant off of her, she was able to physically communicate her lack of consent to appellant. In other words, once awake, she was cognizant of what was happening to her and physically resisted appellant. She was no longer "incapacitated." *See MCM*, 2008, pt. IV, ¶ 45.a. (c)(2); ¶ 45.a.(t)(14). However, when appellant continued to engage in the sexual act by using physical strength to

overcome PFC JCL's resistance he committed the offense of rape. *Id*. at ¶ 45.a.(t)(5) ("The term 'force' means action to compel submission of another or to overcome or prevent another's resistance by . . . physical violence, strength, power, or restraint applied to another person, sufficient that the other person could not avoid or escape the sexual conduct.").

In short, our read of the evidence is that the aggravated sexual assault ended when PFC JCL woke up to appellant having sex with her and offered physical resistance. When appellant used force to overcome PFC JCL's resistance, he commenced to rape PFC JCL. There was no point in time when appellant was committing both offenses simultaneously. Therefore, we find the two specifications address separate acts.

To be sure, both offenses were committed during the course of one ongoing sexual act.[12] This court has in other cases found that factor to be controlling. *See United States v. Kremer*, ARMY 20130592, 2015 CCA LEXIS 366, at *6 (Army Ct. Crim. App. 27 Aug. 2015) (summ. disp.) *review denied*, 75 M.J. 117 (C.A.A.F. 24 Nov. 2015) ("Appellant's convictions for rape and aggravated sexual assault as charged are predicated upon the same continuing criminal act."). However, we find *Kremer* unpersuasive for two reasons. First, *Kremer* involved a case of preserved error. *Id*. at *4. Second, and more importantly, to dismiss the specification of aggravated sexual assault would be to no longer hold appellant accountable for having sexual intercourse with PFC JCL while she was asleep; an offense for which the panel found appellant guilty and which we find to be factually sufficient. As the rape of PFC JCL did not begin until after the aggravated sexual assault had ended, these offenses were aimed at two separate criminal acts. Accordingly, we find this factor weighs heavily in favor of affirmance.

As to the third factor—does the number of specifications misrepresent or exaggerate appellant's criminality—we again find that this weighs in favor of affirmance. For the reasons similar to those just stated, it would be a misrepresentation of appellant's criminality were we to dismiss one of the specifications. Appellant committed an aggravated sexual assault and then committed rape. To hold appellant accountable for his conduct requires affirming both specifications.

---

[12] That there was one continuing sexual act is a fair reading of the evidence introduced at trial. However, we again note that since there was no objection at trial, PFC JCL was never asked whether because of her initial struggle or other reasons, there were multiple penetrations. That the record is undeveloped on this point because of the failure to object at trial does not weigh in favor of providing relief.

For the fourth factor, the fact that the offenses were treated as one for sentencing, means that there was no unreasonable increase in appellant's punitive exposure. Additionally, as the offense of rape includes a maximum sentence of confinement for life without the possibility of parole, the offense of aggravated sexual assault did not alter appellant's punitive exposure.

As to the fifth and final factor the record is devoid of any evidence of prosecutorial overreach or abuse in drafting the charges. Accordingly, this factor too weighs in favor of affirmance.

Accordingly, we do not find the offenses of aggravated sexual assault and rape to be unreasonably multiplied.[13]

### D. Unreasonable Multiplication of Charges
### Damage to Government Property

Appellant's final assignment of error argues that the two specifications of damaging government property were unreasonably multiplied. Specification 1 of Charge II alleged that appellant damaged military property by throwing exercise equipment through a barracks room wall. Specification 2 of Charge II alleged that appellant damaged military property, a table in his barracks room, by setting fire to it. The evidence introduced at trial revealed that both offenses were discovered at the same time and were likely committed contemporaneously. However, each offense alleges a separate and distinct criminal act with separate and distinct harms. Accordingly, we do not find the military judge erred, (plain or otherwise), in failing to find the offenses unreasonably multiplied. Nonetheless, as government appellate counsel now argues in favor of merging the offenses, and as a merged specification adequately accounts for appellant's conduct, we will exercise our discretionary authority to approve only those findings that "should be approved" and approve a specification that merges the two specifications into one.

## CONCLUSION

Specifications 1 and 2 of Charge II are consolidated into a single specification, numbered Specification 1 of Charge II, and that specification is amended to read as follows:

> In that PV1 Bryant K. Marsh, did, on or about 5 December
> 2011, without proper authority, willfully damage by
> throwing exercise equipment through walls and by setting

---

[13] The government in its brief cited *United States v. Elespuru*, 73 M.J. 326 (C.A.A.F. 2014) in support of their concession that the offenses were unreasonably multiplied. We find *Elespuru* inapplicable as this is not a case where the offenses were charged in the alternative, and accordingly, we reject the government's concession.

on fire a table in building 5-4805, military property of the
United States, the amount of said damage being less than
$500.00.

The finding of guilty to Specification 1 of Charge II, as so amended, is
AFFIRMED. The finding of guilty to Specification 2 of Charge II is set aside and
that specification is DISMISSED. The remaining findings of guilty are AFFIRMED.

We are able to reassess the sentence on the basis of the errors noted and do so
after conducting a thorough analysis of the totality of the circumstances presented
by appellant's case and in accordance with the principles articulated by our superior
court in *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013) and
*United States v. Sales*, 22 M.J. 305 (C.M.A. 1986).

In conducting a sentence reassessment, a Court of Criminal Appeals must
"assure that the sentence is appropriate in relation to the affirmed findings of guilty,
[and] that the sentence is no greater than that which would have been imposed if the
prejudicial error had not been committed." *Sales,* 22 M.J. at 307-08 (quoting *United
States v. Suzuki*, 20 M.J. 248, 249 (C.M.A. 1985)). "[I]f the court can determine to
its satisfaction that, absent any error, the sentence adjudged would have been of at
least a certain severity, then a sentence of that severity or less will be free of the
prejudicial effects of error. . . ." *Sales*, 22 M.J. at 308.

In evaluating the *Winckelmann* factors, despite consolidating Specifications 1
and 2 of Charge II and approving only a finding of damage to military property of
less than $500.00, there is no dramatic change in the penalty landscape, as appellant
faced the possibility of life without parole based solely upon his conviction for rape.
Second, although appellant was sentenced by a panel of officer members, we have
extensive experience dealing with cases involving sexual crimes and property
crimes. We are convinced that, absent the separate specifications for the damage to
military property, the panel would have sentenced appellant to at least the sentence
adjudged. Third, the gravamen of the criminal conduct within the original offenses
remains substantially the same. Appellant remains convicted of rape, aggravated
sexual assault, and willful damage of military property. Thus, neither the penalty
landscape nor the vast majority of admissible aggravation evidence has significantly
changed.

Reassessing the sentence based on the noted errors and the entire record, we
AFFIRM the approved sentence of a dishonorable discharge, confinement for
nineteen years and three months, and forfeiture of all pay and allowances. All
rights, privileges, and property, of which appellant has been deprived by virtue of
that portion of the findings set aside and dismissed by this decision are ordered
restored. *See* UCMJ arts. 58b(c) and 75(a).

Judge PENLAND concurs.

HAIGHT, Senior Judge, concurring in part and dissenting in part:

I concur with every part of the majority opinion except that with respect to the declination to consolidate the rape and aggravated sexual assault offenses. I would affirm only one of these convictions because of what I perceive to be the appropriate unit of prosecution for penetrative sex crimes.

This case presents us with a scenario where appellant sequentially committed two different sex crimes during a single act of penile penetration. Under such circumstances, this ongoing crime is a "continuous-course-of-conduct offense." *United States v. Neblock*, 45 M.J. 191, 197 (C.A.A.F. 1996). As such, I believe the proper unit of prosecution—for any penetrative sex crime—to be the number of penetrations.[14] *See United States v. Lloyd*, 46 M.J. 19, 24 (C.A.A.F. 1997).

Our two sister panels have both addressed this current scenario where the criminal circumstances during a singular act of sexual penetration change from satisfying the elements of one offense to then satisfying the elements of another offense. Both panels allowed only one conviction to stand, with one panel merging specifications and another dismissing an aggravated sexual assault charge while affirming a rape conviction. *See United States v. Hall*, ARMY 20130431, 2016 CCA LEXIS 235, at *7 (Army Ct. Crim. App. 15 Apr. 2016) (summ. disp.); *United States v. Kremer*, ARMY 20130592, 2015 CCA LEXIS 366, at *7-8 (Army Ct. Crim. App. 27 Aug. 2015) (summ. disp.) *review denied*, 75 M.J. 117 (C.A.A.F. 24 Nov. 2015). I would approve only one conviction for engaging in a sexual act with appellant's victim by force and while she was incapacitated. UCMJ art. 66(c). Appellant should only stand convicted of one of these offenses, especially in light of the government's concession on this issue.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[14] That is not to say that it would be proper to charge each penetration of one continuous course of sexual conduct in separate specifications. *See United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001).