# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
SMAWLEY,[1] POND,[2] and PARKER
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist RICHARD N. GROCE**
**United States Army, Appellant**

ARMY 20230020

Headquarters, Fort Campbell
Travis L. Rogers, Military Judge
Lieutenant Colonel Joshua J. Smith, Acting Staff Judge Advocate (pretrial)
Lieutenant Colonel Jason A. Coats, Staff Judge Advocate (post-trial)

For Appellant: Captain Kevin T. Todorow, JA (argued);[3] Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Major Robert W. Rodriguez, JA; Captain Kevin T. Todorow, JA (on brief).

For Appellee: Major Joseph H. Lam, JA (argued); Colonel Christopher B. Burgess, JA; Lieutenant Colonel Jacqueline J. DeGaine, JA; Major Chase C. Cleveland, JA; Major Joseph H. Lam, JA (on brief).

23 July 2024

---------------------------------
MEMORANDUM OPINION
---------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

---

[1] Chief Judge SMAWLEY took action on this case prior to his departure from the Court.

[2] Judge POND took action on this case prior to her designation as Chief Judge by The Judge Advocate General.

[3] The court heard oral argument in this case on 11 April 2024 at Northern Illinois University College of Law as part of the court's outreach program.

GROCE — ARMY 20230020

POND, Judge:

Appellant asserts three assignments of error, one of which warrants discussion and relief. Appellant asserts the impact of unlawful command influence (UCI) requires setting aside the findings and sentence in this case. For the reasons discussed below, we agree with appellant that the government did not meet its burden in proving the facts did not constitute UCI. We provide relief in our decretal paragraph.[4]

## BACKGROUND

On 31 December 2020, appellant spent a night of drinking in Clarksville, Tennessee at ▮▮▮▮▮▮▮▮▮▮'s apartment for New Year's Eve. As appellant drank throughout the evening, he became "a little aggressive" and "irritated." Outside the apartment, appellant and ▮▮▮▮ began arguing, pushing, and shoving each other. Appellant then squatted down, grabbed ▮▮▮▮ by the ankles, picked him up, and "slammed" him into the ground. ▮▮▮▮▮'s head and face hit the cement followed by the rest of his body. ▮▮▮▮▮▮'s wife and a friend helped him back inside before taking ▮▮▮▮ to the Emergency Room in Clarksville. ▮▮▮▮▮ ▮ suffered "swelling and bleeding in his brain," a fracture on "the back of the spine," and a cervical spine fracture in his neck. These injuries served, in part, as the basis of ▮▮▮▮'s medical separation from the Army.

Later that same New Year's Eve, Clarksville police responded to a call about a suspicious person outside ▮▮▮▮'s apartment building and found appellant and two other men standing outside. The police waited with appellant for his ride, but when appellant got too close, "right in [the] face" of one of the police officers, Officer ▮▮▮ put his arm out to put distance between himself and appellant. Appellant then grabbed onto the officer's vest, refused to let go, and resisted as the officers tried to subdue and handcuff him. The Clarksville police arrested appellant for public intoxication and resisting arrest. Appellant was also charged by civilian authorities with aggravated assault of ▮▮▮▮▮.

On 30 April 2021, appellant appeared in Montgomery County Court for his pending civilian charges. The county court judge reduced the aggravated assault charge, to simple assault and granted a judicial diversion of the case resulting in six months supervised probation. If appellant successfully completed the probation, the

---

[4] We have given full and fair consideration to appellant's other assignments of error, to include matters submitted personally by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find they lack merit and warrant neither discussion nor additional relief.

2

charges would be dismissed. On 29 October 2021, appellant completed the terms of diversion, and the Montgomery County Court dismissed the charges.

About eight months later, on 29 June 2022, appellant's company commander, Captain (CPT) ▇▇ preferred charges against appellant for the same misconduct. He did so after consulting with his military justice advisor and trial counsel who advised him to prefer charges rather than allow appellant's administrative separation to continue.

Before trial, the defense filed a motion to dismiss for defective preferral for failing to comply with procedures outlined in Army Regulation [AR] 27-10 and unlawful command influence. At the time of appellant's court-martial, AR 27-10, para. 4-3(c) provided that when the summary court-martial convening authority "believes that trial by court-martial is appropriate, in a case where civilian authorities exercised or plan to exercise criminal jurisdiction over the same matter, that officer will cause a full written report, complete with draft charges prepared by the supporting trial counsel, to be forwarded to the [General Court-Martial Convening Authority (GCMCA)]." AR 27-10, Legal Services: Military Justice, para. 4-3(c), (20 November 2020)[AR 27-10]. It further provided that the GCMCA, "after consulting with the supporting [Staff Judge Advocate (SJA)], may, at the GCMCA's discretion, dispose of such charges, or by endorsement, authorize a subordinate to take such action." Id.[5]

Before referral of charges, the SJA advised the GCMCA that there was no report from a subordinate commander as required by AR 27-10 because the government was unaware of the civilian charges until the Article 32 preliminary hearing, but based upon "the severity of the misconduct and the nature of the disposition by the authorities," the SJA recommended trial by general court-martial. The SJA advice also stated the chain of command recommended disposition at trial by court-martial.

During litigation of the motion to dismiss, the defense called appellant's commander, CPT ▇▇ Captain ▇▇ testified he was hesitant to prefer charges

---

[5] The regulation also states: "In cases where civilian criminal prosecution is pending, the supporting trial counsel will contact the civilian prosecutor's office and will attach to the report an analysis of the expected civilian case and any military-specific offenses that may arise from the alleged misconduct at issue." Id.

against appellant, as appellant was already facing an administrative separation, he had no issues with appellant, and believed him to be "a great Soldier."[6]

Captain ▓ testified that shortly before he was scheduled to change out of command, he was contacted by CPT WM, a trial counsel "up at Division." Captain WM "was like 'Hey, we are looking at preferring charges on this person. I'd love to come down and talk to you about it.'" Captain ▓, who believed a court-martial was unnecessary and too harsh, replied that CPT WM was "going to have to do some convincing." Captain ▓ did not believe court-martialing appellant was aligned with the interests of good order and discipline. The two exchanged some "really short" text messages and then "the day we preferred charges he came down and spent maybe an hour or two before we brought [appellant] in." They discussed CPT ▓'s hesitation to prefer charges, especially considering appellant's pending administrative separation, and the soldier's expectation – "to have that promise to the Soldier, on what they think is going to happen, and then a year later, as they are kind of figuring out their life after the Army, to turn on this side and go through reading the charges" caused CPT ▓ to hesitate. Captain WM's response was "well, there's enough attention at 'Division'" and that if CPT ▓ did not read the charges, the charges would go to the next company commander or one of his superiors "and eventually, the charges would be pursued."

Captain ▓ testified that although he did not think it was "the commanding general standing behind [him]" directing him to prefer charges, he did think it was "the organization of Division looking at [appellant's] case" and stated that because "Division is looking at this, the command is looking at this . . . and likely at some level will prefer charges" it was his "duty as his commander, to do it before someone else did." Captain ▓ believed it would be best for appellant if he was the one to prefer charges because he had "a decent working relationship with [appellant]" and "a level of trust" with him and he "wanted to minimize stress on the Soldier."

Captain ▓ further testified that he did not think he would be reprimanded if he did not prefer charges but "we are based on [Officer Evaluation Reports]." His OER was not the driving force in his decision to prefer but he testified it is "in the back of every officer's mind . . . whether they admit it or not" and it "may have factored in at some point in time." The tipping point in his decision occurred when CPT WM told him that if he preferred charges, CPT ▓ was not the judge or jury and would not have to make a decision about appellant's guilt.

---

[6] The victim, ▓, who testified under subpoena, stated he had written a letter in support of administrative separation of appellant under Chapter 10 of Army Reg. 27-10.

4

Defense counsel asked CPT ███, "if you had known that [appellant] had been tried and punished in a civilian court, you would not have preferred charges. Is that an accurate statement?" to which CPT ███ replied, "Yes. In the conversation we are talking now, yes."

The 155-page preferral packet included some references to appellant's civilian police and court case numbers but did not mention the disposition of appellant's offenses by Montgomery County, specifically that the charges had been dismissed. Months prior to preferral, Captain ███ had a "very quick conversation" with his military justice advisor, CPT JD, about appellant's case. Captain JD testified after being contacted by an attorney up at Division, she advised CPT ███ that disposition through administrative separation – the current course of action – was "not a good fit" due to ████'s significant injuries. After being provided a civilian case number for appellant, Captain JD did not follow up with civilian law enforcement or civilian prosecutors to confirm whether appellant's misconduct had been tried or was pending in civilian court.

The government submitted Memorandums for Record from CPT WM along with others for the military judge to consider in ruling on defense's motion. While the government called the military justice advisor, CPT JD, to testify, the government chose not to call CPT WM at the hearing. Ultimately, the military judge denied the defense's motion.

Subsequently, an enlisted panel sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of aggravated assault by inflicting substantial bodily harm on ████, and one specification of assault consummated by a battery of Officer ██ in violation of Article 128, Uniform Code of Military Justice, 10 U.S.C. § 928 [UCMJ].[7] The panel sentenced appellant to a bad-conduct discharge.

## LAW AND DISCUSSION

"This Court reviews allegations of UCI de novo." *United States v. Gilmet*, 83 M.J. 398, 403 (C.A.A.F. 2023) (citation omitted). "We accept as true the military judge's findings of fact on a motion to dismiss for unlawful command influence unless those findings are clearly erroneous." *United States v. Proctor*, 81 M.J. 250, 255 (C.A.A.F. 2021) (citation omitted); *see also United States v. Bergdahl*, 79 M.J. 512, 520 (Army Ct. Crim. App. 2019).

---

[7] The panel acquitted appellant of the greater offense of assault upon a person in the execution of law enforcement duties but guilty of the lesser included offense of assault consummated by a battery in violation of Article 128, UCMJ.

Article 37(a), UCMJ, as amended, provides:

> No person subject to this chapter may attempt to coerce or, by any unauthorized means, attempt to influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority or preliminary hearing officer with respect to such acts taken pursuant to this chapter as prescribed by the President.

UCMJ art. 37(a)(3).

The statute further provides that while a superior convening authority or officer may generally discuss with a subordinate, matters to consider in deciding on disposition of alleged UCMJ violations, "[n]o superior convening authority or officer may direct a subordinate convening authority or officer to make a particular disposition in a specific case or otherwise substitute the discretion of such authority or such officer for that of the subordinate convening authority or officer." UCMJ art. 37(a)(5).

Actual UCI "has commonly been recognized as occurring when there is an improper manipulation of the criminal justice process which negatively affects the fair handling and/or disposition of a case." *United States v. Boyce*, 76 M.J. 242, 247 (C.A.A.F. 2017). While "an SJA is neither a commander nor a convening authority," our superior court has "held that actions by an SJA may constitute unlawful command influence." *United States v. Hamilton*, 41 M.J. 32, 37 (C.A.A.F. 1994) (stating an SJA generally acts "with a mantle of authority") (citation omitted)); *see also United States v. Barry*, 78 M.J. 70, 76 (C.A.A.F. 2018) (holding someone acting without the mantle of command authority can commit unlawful influence).

To establish a prima facie claim of actual UCI, the accused must present "some evidence" of UCI, that is "(a) facts, which if true, constitute unlawful command influence; (b) the court-martial proceedings were unfair to the accused (i.e., the accused was prejudiced); and (c) the unlawful command influence was the cause of that unfairness." *Boyce*, 76 M.J. at 248 (C.A.A.F. 2017). "Once the accused satisfies his burden, the burden shifts to the Government to prove beyond a reasonable doubt that the UCI will not affect the proceedings." *Gilmet*, 83 M.J. at 403 (citing *United States v. Biagase*, 50 M.J. 143, 150-51 (C.A.A.F. 1999)). Alternatively, "the Government can also disprove the predicate facts upon which the UCI allegation is based or persuade the Court that the facts do not constitute UCI." *Id.* at 403 n.4 (citation omitted).

The government argues that appellant failed to make a prima facie case of UCI, because even if the factual allegations were true, they would not constitute evidence of UCI. We disagree. We find that the statements made to CPT ███ that "division was recommending preferral" coupled with the statement that "someone else would prefer charges" if CPT ███ did not *after* the command had already initiated administrative separation constituted a prima facie case of UCI – that is, directing a subordinate convening authority or officer to make a particular disposition in a specific case or otherwise substitute their discretion in violation of Article 37. These facts were enough to show some evidence of UCI, which then shifted the burden to the government. We find the government did not meet that burden when it failed to rebut beyond a reasonable doubt that the facts asserted by the defense did not amount to UCI.

This is not simply a case where a trial counsel was giving legal advice to a commander. Here, CPT ███ had already decided appellant's case would be handled administratively. The trial counsel sought to change the commander's mind and in doing so, informed CPT ███ that there was enough attention at "Division" and that if he did not read the charges, someone else would. This was enough to create a presumption that the trial counsel was not giving their own legal opinion as to how to dispose of the case but was instead conveying the wishes of a superior authority at Division. It was also enough to cause CPT ███ to contemplate what might happen to his OER if he did not prefer charges. The government then failed to elicit testimony from CPT ███ or to call CPT WM to testify to rebut that presumption.

The government relies on *United States v. Miller*, 31 M.J. 798, 799 (A.F.C.M.R. 1990), to show that the legal advisor's actions did not amount to UCI. In *Miller*, the Air Force Court of Criminal Appeals found no UCI in a similar case where a commander believed he had no choice but to prefer charges against an accused when an SJA told him if he did not prefer charges someone else would do it. *Id.* In that case, the commander also had reservations in preferring charges and had initially thought "nonjudicial punishment or some other lower[-]level disciplinary action might be appropriate." *Id.* at 800. In *Miller*, however, the commander specifically stated, "he was preferring the charges on his independent will and was not being ordered or coerced to do so" nor did he feel the SJA had "pulled rank" on him. *Id.* at 802-03. Although the court did not find UCI in *Miller*, the court found events in the case to be "dangerously close to a defective preferral or improper command influence." *Id.* at 803. The court concluded that "[a]lthough we found no unlawful command influence in this case, similar fact situations have reached that level in other cases." *Id.* On further appeal, our superior court was also "troubled by the circumstances surrounding the pretrial proceedings" in *Miller* and joined the Court of Criminal Appeals (CCA) "in its wise words of caution." *United States v. Miller*, 33 M.J. 235, 237 n.* (C.M.A. 1991).

Here, unlike in *Miller*, CPT ▓ did not provide unequivocal testimony that he was not coerced or directed in making a decision to prefer and forward court-martial charges. *Compare also Boyce*, 76 M.J. at 246 (finding no actual UCI where convening authority stated "I did not and would not allow improper outside influence to impact my independent and impartial decisions" and affirmatively disclaimed the impact of any comments by superiors on his decision-making and where the military judge found the convening authority "may be the most bombproof of any convening authority out there"); *compare also Hamilton*, 41 M.J. at 36 (C.A.A.F. 1994) (where the commander who preferred charges stated unequivocally he did not feel pressured to take any UCMJ action that he did not believe was appropriate, that he always makes his own decisions on UCMJ actions and was never told the commanding general wanted any particular level of disposition of the charges in appellant's case). Here, after being told there was enough attention at "Division," Captain ▓ candidly testified his OER may have factored in at some point and that the tipping point was not that he believed court-martial was the right disposition, but that CPT WM told him he would not have to make a decision on appellant's guilt. This is far from an affirmative disclaimer of coercion or improper influence that has survived scrutiny in other cases.

Additionally, our focus in this case is slightly different from *Miller*. In *Miller*, the Air Force CCA looked to the provisions of Rule for Courts-Martial [R.C.M. 307] governing the preferral of charges and asked whether the accuser in that case felt coerced or forced by anyone to take the oath and prefer charges. Our focus is grounded not as much in R.C.M. 307 but in R.C.M. 401 governing the forwarding and disposition of charges and Article 37's prohibition against substituting or improperly influencing a commander's independent discretion to dispose of a case how he or she sees fit. *See* R.C.M. 401(c)(2), discussion ("No authority may direct a commander to make a specific recommendation as to disposition."). Here, the government failed to rebut the evidence that CPT WM's comments and reference to "Division" improperly manipulated the company commander's independent discretion in disposing of appellant's case.

We are unpersuaded by appellant's argument that the legal office's failure to follow the provisions of AR 27-10 is a basis for unlawful command influence where the evidence indicates the failure to learn of the civilian court charges was not intentional.[8] We also disagree that paragraph 4-3 of AR 27-10 confers a separate

---

[8] The recent amendments to Article 37 reflect a Congressional intent for UCI to be intentional rather than unintentional. The Court of Appeals for the Armed Forces previously held that the plain language of a prior version of Article 37 did not require an intentional act where the syntax "attempt to coerce or, by any unauthorized means, influence the action" demonstrated that "attempt to" only

(continued . . .)

right to appellant to have his charges dismissed. *Compare United States v. Dunks*, 1 M.J. 254, 255-56 (C.M.A. 1976) (discussing a different provision of AR 27-10 which provided that if the charges were not preferred within 45 days, the accused was entitled, under certain conditions, to dismissal of the charges). That said, while the government may not have known about appellant's civilian court case prior to preferral, the legal advisor's decision not to go back to the chain of command after learning about the civilian court case to confirm that their recommendations remain unchanged is enough, under these circumstances, to create a further inference of improper manipulation of the proceedings. It created an inference that "Division" was uninterested in its subordinate commanders' independent disposition decisions in appellant's case. A superior commander is always free to withhold disposition of a case at their level, however, that did not happen here. And the government failed to rebut the evidence of UCI beyond a reasonable doubt.

Defense presented facts that the "Division," through its legal advisors, improperly interfered with the commander's independent decision on disposition of appellant's case. While not "every instance of advice or expression by [a legal advisor] is attributed to his or her commander," it is incumbent upon legal advisors to "make it clear when they are expressing the view of their commanders and when they are expressing their own legal opinions." *Hamilton*, 41 M.J. at 37. The government in this case failed to rebut this evidence when they did not call CPT WM to testify or provide clear, unequivocal testimony through CPT ▮ that he was not improperly influenced into preferring and forwarding charges for court-martial. The government also failed to show evidence that any UCI was subsequently cured. As a result, we find the government failed to meet its burden to prove beyond a reasonable doubt that the facts presented did not constitute UCI. We further find the government's actions materially prejudiced appellant's substantial right to have his commander make an independent decision as to the disposition of his case, pursuant to Article 37, UCMJ, to ensure fairness in the court-martial proceedings. Based on the evidence before this court, we are not convinced that appellant's case would

---

(. . . continued)
applied to the verb "coerce" and not the verb "influence" and thus, an "attempt to coerce" necessarily required intent whereas influencing an action by unauthorized means" violated the statute "regardless of intent." *United States v. Barry*, 78 M.J. 70, 78-79 (C.A.A.F. 2018). Congress subsequently amended Article 37 to also include the words "attempt to" immediately before the words "influence the action." *See* National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, §532, 133 Stat. 1198, 1359-60 (2019). Thus, under the new statute, it would appear unintentional acts would be insufficient to meet the intent required by Article 37, UCMJ.

have been preferred and forwarded for court-martial absent the government's actions. *Compare Boyce*, 76 M.J. at 250.

## CONCLUSION

The findings of guilty and the sentence are SET ASIDE. A rehearing is authorized.

Chief Judge SMAWLEY and Judge PARKER concur.

FOR THE COURT:

// JAMES W. HERRING, JR.
Clerk of Court